**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Kashani FARHAD, Defendant–Appellant.**

**No. 97–10044.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1998.

Decided Sept. 13, 1999.

Sanford Svetcov, Landels Ripley & Diamond, San Francisco, California, for defendant-appellant.

David Shapiro, Assistant United States Attorney, San Francisco, California, for plaintiff-appellee.

Before: SCHROEDER, REINHARDT, and HAWKINS, Circuit Judges.

Per Curiam Opinion; Concurrence by Judge REINHARDT.

## PER CURIAM:

Kashani Farhad appeals from his conviction on fourteen counts of mail fraud in violation of 18 U.S.C. § 1341, and five counts of the false use of social security numbers in violation of 42 U.S.C. § 408(a)(7)(B). All of the offenses relate to a scheme perpetrated by Farhad, while he was a state prisoner, to fraudulently obtain state income tax refunds. Despite the fact that the Federal Public Defender was appointed on his behalf, Farhad elected to represent himself. Following a trial, the jury convicted him on all counts. Farhad asserts on this appeal that he did not knowingly, intelligently, and unequivocally waive his right to counsel. Moreover, he argues that even if his election to represent himself was sufficient under current constitutional standards, the right to self-representation itself should be reconsidered, and the Supreme Court case establishing that right, *Faretta v. California*, should be overruled. We affirm.

### Factual and Procedural Background

Kashani Farhad, while serving an unrelated sentence in the California state penitentiary at San Quentin, filed 29 false tax returns claiming refunds from 16 states. Although Farhad used his own name, prisoner identification number, and prison address, he utilized fictitious employers and social security numbers. Before the San Quentin authorities became suspicious—due to the volume of mail containing checks that Farhad received from state tax bureaus—Farhad successfully collected approximately $20,000 in refund checks, which were deposited into his prison trust account. He used these funds to purchase food and other personal items from the prison commissary. At the time, Farhad was earning $116.09 per month from his prison job; his account balance at the time he was caught was $19,742.

Farhad was indicted, and a federal public defender was appointed to represent him. On July 2, 1996, however, Farhad informed the district court that, after consulting with his attorney, he had decided to represent himself. He explained that his decision was motivated principally by the belief that he could put forth a more effective defense than could the public defender.

The district court responded by holding a hearing and questioning Farhad under oath about his decision to elect self-representation. The district judge warned Farhad that he was charged with 19 counts, informed him of the maximum penalty on each count, and pointed out the potential consequences for him in state prison if he incurred a new federal conviction. Farhad replied that he understood the judge's concern but that he remained convinced that he would present a more effective defense than would appointed counsel.

In addition, the district court repeatedly warned Farhad that he was "making things harder" for himself by electing to proceed without a lawyer. The judge admonished Farhad that he would be responsible for arguing motions and making objections, he would have to abide by the rules of evidence and procedure, and he would "not get any breaks from the Court." She predicted that the jury would have a difficult time understanding Farhad due to his accent. She told him numerous times that he had a right to be represented by an attorney who could "ask questions and make arguments properly," and who would be familiar with the rules of

evidence. The district judge also informed Farhad that he would not have the right to have stand-by counsel or to the use of an investigator, nor the right to any additional access to the law library. When Farhad indicated that he still wished to proceed, in spite of all of these admonitions, the district court informed him that if he went forward without an attorney, he would have no right to appeal based on a claim of ineffective assistance of counsel or because he "got a bad trial." Nevertheless, Farhad continued to insist upon his "absolute right" to act as his own attorney.

Notwithstanding her warning that Farhad would not be entitled to stand-by counsel, the district judge appointed an assistant public defender to serve in that capacity. Farhad consented to the appointment of standby counsel, but indicated that he would prefer to utilize a "hybrid" form of representation. He stated that he wanted to make the opening and closing statements as well as exercise challenges during jury selection, but that he would like stand-by counsel to perform all the other tasks of representation. The district court flatly rejected this arrangement, and told Farhad that "it cannot be done that way. You do it all or he does it all." Farhad then abandoned this request.

Following this colloquy, the district court made a finding of fact that Farhad had knowingly and voluntarily waived his right to counsel, and permitted him to proceed pro se. During pre-trial preparations over the ensuing weeks, the district court on several occasions reminded Farhad that he had a right to counsel and asked whether he wanted to change his mind and revoke his decision to represent himself. In particular, when the district court refused Farhad's request for an investigator to help him locate and interview witnesses, it said:

> You've chosen to represent yourself. Now if [the public defender] were representing you in this case, then he has a number of resources available to him ... That's why you're really hurting your chances in this case by doing this. You can reconsider, by the way, if you

> want to change your mind, and get [the public defender] to represent you.

In response, Farhad reaffirmed that he would represent himself.

Farhad acted as his own lawyer at trial, and was convicted on all counts. He was sentenced to 27 months imprisonment and ordered to pay $19,095.70 in restitution. This appeal followed.

## Analysis

### I. *Validity of Farhad's Waiver*

A criminal defendant is entitled to waive his Sixth Amendment right to counsel. *See Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A waiver of the right to counsel must be knowing, intelligent, and unequivocal. *See United States v. Arlt,* 41 F.3d 516, 519–20 (9th Cir.1994); *United States v. Balough,* 820 F.2d 1485, 1487 (9th Cir.1987). The burden of proving the legality of the waiver is on the government. *See United States v. Mohawk,* 20 F.3d 1480, 1484 (9th Cir.1994). We approach this question cautiously, indulging "every reasonable presumption against waiver." *United States v. Arlt,* 41 F.3d 516, 520 (quoting *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). Applying these standards, we conclude that Farhad validly waived his right to counsel.

A waiver of counsel will be considered knowing and intelligent only if the defendant is made aware of (1) the nature of the charges against him; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Balough,* 820 F.2d at 1487 (citing *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525); *United States v. Van Krieken,* 39 F.3d 227, 229 (9th Cir.1994). In this circuit, the "preferred procedure" to ensure the validity of a waiver is for the district court to discuss each of the three elements with the defendant on the record

in open court. *See Balough,* 820 F.2d at 1487; *Van Krieken,* 39 F.3d at 229.

■ Here, the record demonstrates that the district court conscientiously conducted the appropriate inquiry. When Farhad invoked his right to self-representation, the district court immediately placed him under oath and held a hearing in open court. During the course of that hearing, the district judge informed Farhad of the charges against him and the possible penalties he faced if convicted; she even went so far as to point out that in the event of a conviction, Farhad might face additional disciplinary measures in state prison. Moreover, the district court informed Farhad about the "core functions" of an attorney that he would be expected to perform at trial, as well as the superior ability of a lawyer to handle those tasks. *See Mohawk,* 20 F.3d at 1484. Farhad was warned that he would be expected to ask questions, make arguments, and observe the rules of evidence and courtroom procedure. He was furthermore informed that there were resources, such as investigators and legal research tools, that were unavailable to him, but which were available to attorneys.

■ Despite the district court's numerous warnings and entreaties that he was "making it hard on himself," Farhad repeatedly stated that he understood but felt that he could provide a more effective defense. On this basis, the district court found as a matter of fact that Farhad's waiver was knowing and intelligent, a finding this court considers "influential." *United States v. Robinson,* 913 F.2d 712, 715 (9th Cir.1990). Moreover, the district judge revisited the issue on several occasions prior to trial, urging Farhad to change his mind. In each instance, Farhad insisted that he would represent himself. Thus, the record in this case conclusively demonstrates that Farhad sufficiently "understood his right to counsel and ... waived that right knowingly, intelligently, and voluntarily." *Van Krieken,* 39 F.3d at 230.

In addition to being knowing and intelligent, a valid waiver of the right to counsel must be unequivocal. *See Van Krieken,* 39 F.3d at 229; *Adams v. Carroll,* 875 F.2d 1441, 1444 (9th Cir.1989). In *Van Krieken,* this court found a waiver to be unequivocal where the defendant repeatedly expressed to the court his desire to waive his right to counsel, and persisted in waiving his right even after being warned about the dangers and disadvantages of proceeding without an attorney. Under the circumstances, this court concluded that Van Krieken's waiver was not a "mere whim or caprice" and was thus unequivocal. *Van Krieken,* 39 F.3d at 230 (citing *Robinson,* 913 F.2d at 714). Here, the district court, as in *Van Krieken,* repeatedly reminded Farhad of the hardships of self-representation and asked him whether he wanted to reconsider. Each time, Farhad reaffirmed his determination to act as his own attorney. As in *Van Krieken,* Farhad's waiver was unequivocal.

Farhad was clearly appraised of the nature of the charges against him, the possible penalties he faced if convicted, and the dangers and disadvantages of undertaking his own *representation.* Nevertheless, he repeatedly expressed his wish to represent himself, and reiterated his sincere, if misguided and unrealistic, belief that he would offer a "more effective" defense than appointed counsel. Under the applicable precedents, his waiver was constitutionally sound.

## II. The Merits of *Faretta*

■ Farhad next urges *that* his conviction should be reversed because *Faretta* was wrongly decided and should be overruled. The Supreme Court has for many years recognized the right to self-representation. *See Faretta,* 422 U.S. at 835, 95 S.Ct. 2525. Recently, the Court extended the *Faretta* right to all defendants, even those who are mentally impaired, so long as they are "competent to stand trial." *Godinez v. Moran,* 509 U.S. 389, 399–400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Following the Supreme Court's direction, this court has published dozens of opinions applying *Faretta* to proceedings in both federal and state courts. *See, e.g., United States v. Keen,* 96 F.3d 425 (9th Cir.1996); *Arlt,* 41 F.3d 516; *Robinson,* 913 F.2d 712; *Savage v. Estelle,* 908 F.2d 508 (9th Cir. 1990); *United States v. Kimmel,* 672 F.2d 720 (9th Cir.1982). Thus, we are compelled by the overwhelming weight of these precedents to apply the law as it currently exists, and not as Farhad might have it.[1] Moreover, we decline Farhad's invitation to offer an advisory opinion on the subject; that is simply not an appropriate exercise of this court's discretion.

The judgment of the district court is AFFIRMED.

REINHARDT, Circuit Judge, concurring specially:

I concur in the per curiam opinion because I agree that we are bound by *Faretta*. I write separately in order to address Farhad's contention that even if his waiver of the right to counsel comported with the Constitution, his trial did not. He points out that his case is not unique and that in many, if not most, cases the right to proceed pro se "deprives the defendant of due process of law by defeating the ability of judges to ensure basic fairness and justice in a criminal trial." Thus, he asserts that *Faretta* should be reconsidered.[1] For the reasons set forth below, I agree.

*I. Overview*

The Supreme Court first recognized the right to self-representation in *Faretta v. California* in 1976. Although this right appears nowhere in the text of the Sixth Amendment, the Court held that the right to the assistance of counsel "necessarily implies" the right to proceed pro se. In one of the dissents, Justice Blackmun, joined by Chief Justice Burger and then-

Justice Rehnquist, pointed out what the three dissenters perceived to be a fundamental flaw in the majority's reasoning. The dissent observed that while the right to counsel is "based on the premise that representation by counsel is essential to ensure a fair trial," the newly-recognized right to waive representation is based on precisely the opposite premise and would directly undermine the fair trial guarantee. *Id.* at 851, 95 S.Ct. 2525. The majority did not respond to the dissenters' concerns about whether the right to self-representation would be inconsistent with the right to a fair trial. The Court instead emphasized that the right to waive the assistance of counsel would advance defendants' interests in dignity and autonomy.

Although *Faretta* has been reaffirmed on several occasions in the almost quarter of a century since it was decided, *see Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the Court has never directly addressed the argument of the *Faretta* dissenters that the Sixth Amendment right to self-representation would lead to unfair trials and unjust convictions. By now, it is clear that the dissenters' concerns have been borne out. Farhad's trial illustrates the effect of this conflict, one that the Court now has the opportunity face squarely. Under *Faretta,* courts have no occasion to assess the consequences of the waiver of the right to counsel on the constitutionality of the trial itself. Nevertheless, on the record, it is quite plain that Farhad, like many criminal defendants who choose to be tried without a lawyer, was convicted in a proceeding so fundamentally flawed that, were it not for *Faretta,* it would undoubtedly offend minimal constitutional standards of fairness.

1. We thus do not reach Farhad's argument that were *Faretta* overruled, 28 U.S.C. § 1654 (granting defendants in federal cases the statutory right to self-representation) would violate the Sixth Amendment.

1. It should be noted that on this appeal, Farhad is no longer pro se, but is represented by an extremely able lawyer, Sanford Svetcov, formerly Chief Assistant United States Attorney for the Northern District of California.

The Constitution guarantees every defendant the fundamental, absolute right to a fair trial. By contrast, the right to counsel (or even the implied right to self-representation) is not absolute. It, like all other procedural guarantees found in the Sixth Amendment, is intended primarily to achieve the substantive objective of a fair trial. Where the right to self-representation conflicts with the paramount Fifth Amendment right to a fair and reliable trial, I believe that the former, and not the latter, must yield. Only one circuit has ever directly acknowledged the existence of this problem, and it summarily concluded that a defendant who elects to proceed pro se implicitly waives his right to a fair trial. *United States v. McDowell,* 814 F.2d 245, 251 (6th Cir.1987). I strongly question whether such a waiver, express or implied, is permissible. Moreover, I think it clear that if such a waiver is allowed, it must at a minimum be a waiver that is knowing, intelligent, and voluntary. I would urge the Court to now recognize the inherent conflict created by *Faretta* and to reconsider the implications of that decision.

## II. Farhad's "More Glorious Kind of a Defense"

It is a key feature of the *Faretta* inquiry that a reviewing court may consider only the fairness of the pre-trial proceedings. Provided that the waiver colloquy was sufficient to establish that the defendant's decision was made with his "eyes wide open," *see Faretta,* 422 U.S. at 835, 95 S.Ct. 2525, the inquiry is at an end. We thus become a judiciary "with eyes wide shut." The whole course of proceedings, most particularly the trial, is rendered irrelevant for constitutional purposes despite the fact that it is wholly apparent to any judge reading the transcript that it was marred by a series of egregious errors, any one of which could have inhibited a fair determination of guilt or innocence, and despite the fact that it was equally apparent at the time of the waiver that the defendant's chances of receiving a fair trial would be remote. Such was the case here

and, as required by *Faretta,* we have averted our gaze—as one might from a train wreck or a freeway crash—from Farhad's pitiful attempt to, in his own words, "make a more glorious kind of a defense."

Because my purpose here is to examine the legality not of the *waiver* but of the *trial* itself, it is essential to recount some of what transpired at Farhad's trial. Farhad's performance at trial was—as everyone involved except him surely expected—a complete disaster. He had to be admonished four times for misstating and arguing the law just during his brief opening statement, which was a rambling, barely intelligible harangue. Despite the fact that the assistant public defender had, prior to Farhad's decision to represent himself, obtained an order restricting the government's ability to introduce evidence of Farhad's prior conviction and current confinement, Farhad blurted out to the jury that

> I am a prisoner myself, you know? I was trying to go make a phone call the other day, and the officers locked me up for two hours, you know? What was the reason they locked me up for two hour, because he doesn't like my face or I don't know. Or you see sometimes, you know, the police officers, they pull somebody off the street—

When the district court sustained an objection that this was irrelevant argument, Farhad argued with the judge in the presence of the jury until she explained that he could talk about it later in closing argument.

Farhad's poor command of English led him virtually to admit guilt during his opening statement. He told the jury, "it's very close, you know that I might have done these things, but you know, its not very certain, you know, that for sure I have done this ... I'm not saying that no checks have been coming to my house. It might have been." He also admitted that he "had some tax forms in my cell" in prison. He concluded by informing the

jury that "it doesn't matter what you think, you know?"

Next, during Farhad's cross-examination of the government's witnesses, he argued with witnesses about the testimony so much that the court interrupted him, asking "Is there a question here? Because you are to ask her questions and get information, not give us speeches. You are to ask questions." His effort to elicit testimony through questioning then led to this damaging colloquy with the correctional officer who searched his cell and discovered the tax forms:

Q. Is that possible, that the boxes, you know, that has my name—it was written by another inmate?

A. No, it was not.

Q. How can that be?

A. Because your cell mate's box was on one end of the bed, and you made sure your box was on the other end. You did not have anything else but a box of income tax forms. And Kashani, if you want to get into it, you're a loner, you have all your stuff to yourself. Nobody even knew much about you. You don't even talk to people at the prison.

Farhad neither objected to this testimony nor asked that it be stricken. He never objected that the government's failure to lay any foundation for the testimony that the bunk searched was Farhad's, but instead admitted that the tax forms were his, and that he was reading them "like a magazine or book."

Farhad's effort to take his own direct testimony was an even worse spectacle. In the course of his testimony, Farhad referred to himself as "you," "me," and "Mr. Farhad." He also called himself both Farhad Kashani and Kashani Farhad. The judge attempted to persuade him to allow his stand-by counsel to take his direct testimony, because she wanted to proceed by using the question-and-answer format, which, she said, would be "very awkward" for Farhad to do alone. It was. His questions were entirely unintelligible, irrelevant, or prejudicial to his own case. One of his very first questions was:

Q. Mr. Farhad, did San Quentin authority throw you in the hole based on a phone call that a department of revenue made to them?

The government's objection to this question was sustained, as were virtually all its other objections. In fact, the district court sustained objections to 20 of Farhad's 52 questions, and struck many of his answers. Farhad did succeed, unfortunately for him, in getting into the record that the tax forms found by prison authorities in his cell were indeed his. Most of his questions, however, made no sense:

Mr. Farhad: What do you think have caused them you might have been guilty of what the tax department has accused you of?

Ms. Gonzales: Objection, irrelevant.

The Court: I'm not sure I understood the question. Could you say it again?

Mr. Farhad: I am saying, what do you think have caused the security squad to make you guilty of the phone call that the tax department made to San Quentin?

The Court: I still don't think the question makes sense. Why don't you try it again?

Mr. Farhad: I have to explain it in order to ask the question, because San Quentin Authority, they received a phone call.

The Court: We'll start one at a time, then. Ask it in the form of a question, one short question at a time.

Mr. Farhad: What do you think—I don't know how to do this.

After a short attempt at asking questions, Farhad again began narrating: "I remember a long time ago" prompting the judge to interrupt him, "Wait, is there a question?" Farhad again said that he just wanted to explain his story to the jury: "I am just explaining why do you think the government is doing this action to you?"

During Farhad's direct examination of himself, he provided a handwriting exemp-

lar to the jury. However, the judge had to instruct the jury to disregard the content of the sample because Farhad had written: "Farhad is an innocent man." Following the judge's cautionary instruction to ignore this impermissible attempt at argument, Farhad said, "Maybe that was not appropriate for me to write that sentence." The judge responded "I know what you are trying, sir."

Farhad also asked himself leading questions that misstated or argued the law (or both). For instance, he again vented his anger over the district court's refusal to allow him the services of an investigator and other of her pretrial rulings:

Mr. Farhad: Q: Do you think that is fair why the prosecution has expensive investigator on her side, you be left with nothing?

Mr. Farhad: A: No, it is not justice.

Ms. Gonzales: Objection, Your Honor. This line of questioning is argumentative and irrelevant.

The Court: Do you want the last answer stricken?

Ms. Gonzales: Yes.

The Court: You are directed, sir, that is irrelevant, and you must go on to something else.

Mr. Farhad: Did you ask for any continuance?

Ms. Gonzales: Objection, irrelevant.

The Court: Same ruling.

The district judge expressed frustration with Farhad's questions, saying "Mr. Farhad had a very hard time asking those questions and in my view never did ask any of those questions properly."

Farhad evinced an utter lack of comprehension of the proceedings. He failed to object at critical points. He had only the sketchiest understanding of the roles played by various people in the courtroom, For example, Farhad asked the court to warn a prosecution witness to answer "yes" or "no" but repeatedly referred to the witness as the "defendant," saying that "the defendant can just go on and on." The judge rebuked him, "she is the witness. You are the defendant—" Farhad

did not understand the meaning of the word "stipulation," or the implication of entering into a stipulation regarding his fingerprints or handwriting. When the stipulated evidence was presented, Farhad asked the court to "take that stipulation away."

At the close of the prosecution's case, Farhad asked the court to have his stand by counsel sit away from him because Farhad thought that the lawyer was laughing and making faces at him, which was, according to Farhad, "not going to look good to the jury." When the judge told Farhad that counsel had not done anything of the sort but was merely trying to protect Farhad's rights, Farhad disagreed and asked her "how can you watch all the time?" The judge then ordered Farhad's standby counsel sit in the back of the courtroom, away from Farhad, where he could not offer any assistance during trial.

Farhad's closing argument was a debacle in which he again demonstrated that he did not understand that the government's case was built on a wealth of circumstantial evidence. He told the jury that he should be "100 percent not guilty" because "there was no video tape. There was no camera. There was no pictures ... There was no DNA." To the extent that Farhad had a theory of his case, it was a disjointed, paranoid, rambling allegation filled with impermissible references to other, unrelated crimes. He told the jury, "I don't have to prove anything the lawyer person (presumably the Assistant United States Attorney) is doing. The person who would be motivated doing this action for a different kind of motivation, like maybe the government has always shown brutality against different people or different types, like killing Malcolm X or Martin Luther King, or even in the Rodney King beating case, that the government was beating the person for no reason." When Farhad at last began to rant and repeat himself, the judge broke into his diatribe and asked whether he was "about finished."

Farhad wrapped up his summation in style, asking the jury to find him *guilty* by returning "a true verdict, a just verdict, that the prosecution has proved its allegation." The jury began deliberating at 9:00 a.m. the next day and found Farhad guilty on all 19 counts before lunch. Farhad filed four pro se notices of appeal.

### III. Fair Trial and Self–Representation

Based on this record, Farhad argues that he "received a wholly unfair trial" that violated his constitutional rights. The Due Process Clause of the Fifth Amendment guarantees every criminal defendant a fundamental, absolute right to a fair trial in a fair tribunal. *Spencer v. Texas*, 385 U.S. 554, 562, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); *In Re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *accord Strickland v. Washington*, 466 U.S. 668, 683, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Mayberry v. Pennsylvania*, 400 U.S. 455, 464, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Malinski v. New York*, 324 U.S. 401, 416, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). The right to a fair trial "is the most fundamental of all freedoms," essential to the preservation and enjoyment of all other rights. *Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Moreover, the right is not solely individual in nature; . it is an essential part of the architecture of American constitutional democracy—"more than an instrument of justice and more than one wheel of the Constitution. It is the lamp that shows that freedom lives." *Duncan*, 391 U.S. at 145 n. 23, 88 S.Ct. 1444. The guarantee of a fair trial "lies at the base of all our civil and political institutions." *Malinski*, 324 U.S at 414, 65 S.Ct. 781.

In determining whether a defendant has received a fair trial, courts are to review the entire proceeding, including the trial itself, and determine whether it meets constitutional standards of fairness:

> The exact question is whether the criminal proceedings that resulted in his conviction deprived him of due process of law by which he was constitutionally entitled to have his guilt determined.

Judicial review of that guaranty ... inescapably imposes on this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.

*Malinski*, 324 U.S. 401, 414, 65 S.Ct. 781, 89 L.Ed. 1029 (Frankfurter, J., concurring).

In short, a fair trial is a proceeding that is designed to maximize the likelihood of a fair and reliable determination of guilt or innocence. Where the procedures used are those that will likely result in such a trial, the trial itself will ordinarily be "fair," although it is possible that events will occur in the course of the proceeding that will produce a contrary result. Where, for one reason or another, the proceedings fall short of the standard the Constitution imposes, and a defendant does not receive a fair trial, he is deprived of due process of law. Thus, as Justice Frankfurter wrote, in the end we must examine "the whole course of the proceedings" to see whether they comport with the "canons of decency and fairness which express [our] notions of justice."

Unlike the right to a fair trial, the right to self-representation is not absolute. *Savage v. Estelle*, 908 F.2d 508, 512 (9th Cir.1990); *Fields v. Murray*, 49 F.3d 1024, 1035–36 (4th Cir.1995). The primary purpose of the Sixth Amendment's specific procedural guarantees is to ensure that convictions are obtained in fair trials. In other words, the Sixth Amendment rights are intended to implement the Fifth Amendment due process guarantees. While those rights are unquestionably important in themselves, elevating a Sixth Amendment procedural right over the fundamental right to a fair trial, as *Faretta* implicitly does, impermissibly elevates form over substance. As Chief Justice Warren, citing an admonition by Justice Holmes, wrote in *Estes:*

It has been agreed that neither the Sixth nor the Fourteenth Amendment is to be read formalistically, for the clear intent of the amendments is that these specific rights be enjoyed at a constitutional trial. In the words of Justice Holmes, even though "every form be preserved, the forms may amount to no more than an empty shell" when considered in the context or setting in which they were actually applied.

*Estes*, 381 U.S. at 560, 85 S.Ct. 1628 (Warren, C.J., concurring). The provisions of the Sixth Amendment are best viewed as "institutional safeguards" for attaining the overarching objective of a fair trial. *Id.* at 588, 85 S.Ct. 1628 (Harlan, J., concurring). To the extent that a particular safeguard does not, under the circumstances, lead to a fair trial, it is inconsistent with settled interpretations of both the Fifth and Sixth Amendments to insist on adherence to that procedure, especially when the almost certain result would be an unfair proceeding and, thus, the denial of due process.

The Supreme Court has previously recognized that individual Sixth Amendment rights are subordinate to society's interest in assuring fair trials in the analogous context of waivers of attorney conflicts of interest. *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). In *Wheat*, a defendant who sought to be represented by a lawyer who also represented his co-defendants attempted to waive the conflict of interest. The trial court refused to permit the waiver, and the defendant argued on appeal that the refusal violated his rights under the Sixth Amendment. In deciding the case, the Supreme Court first observed that the Sixth Amendment right to representation by counsel of choice is not absolute, but is circumscribed by the paramount "institutional interest in the rendition of just verdicts in criminal cases." It then held that because "federal courts have an independent interest in ensuring that ... legal proceedings appear fair to all who observe them," district courts must have wide latitude to refuse waivers of conflicts of interest.

In *Estes*, the Supreme Court also asserted the primacy of the right to a fair trial, and reversed a conviction because televised pre-trial publicity violated the defendant's right to a fair trial. The Court specifically rejected the argument that the Sixth Amendment's guarantee of a public trial required media access to the proceedings even if it would render the trial unfair. 381 U.S. at 540, 583, 588, 85 S.Ct. 1628. Chief Justice Warren's concurrence noted that "the criminal trial under our Constitution has a clearly defined purpose, to provide a fair and reliable determination of guilt, and no procedure or occurrence which seriously threatens to divert it from that purpose can be tolerated." *Id.* at 564, 85 S.Ct. 1628. It may be partly for this reason that the Court pointed out in *Duncan v. Louisiana* that its "decisions interpreting the Sixth Amendment are always subject to reconsideration." 391 U.S. 145, 158 n. 30, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Here, the practice of permitting self-representation regardless of the consequences threatens in many instances to "divert" criminal trials from their "clearly defined purpose" of providing a "fair and reliable determination." Thus, in my view, reconsideration of *Faretta* is warranted.

Without acknowledging the inherent conflict between the right to a fair trial and the right to self-representation, the Court has now carried *Faretta* to its logical conclusion by holding that any defendant, even one who is severely mentally impaired, has the right to act as his own trial lawyer so long as he is minimally competent. *Godinez*, 509 U.S. at 399, 113 S.Ct. 2680 (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (defendant is competent to stand trial if he has rational understanding of the proceedings and can consult with an attorney)). In addition to those mentally retarded or disturbed defendants covered by

...

*Godinez*, juveniles,[2] illiterates,[3] and others who are obviously unable to present effective defenses are now entitled to "enjoy" the *Faretta* right. Other courts have taken the logic of *Faretta* even further, finding a right not only to waive counsel but to waive *competent* counsel and proceed with an *incompetent* lawyer. *See, e.g., People v. Johnson*, 75 Ill.2d 180, 186, 25 Ill.Dec. 812, 387 N.E.2d 688 (1979).[4] Thus, the right to self-representation has now been extended to the point that it frequently, though not always, conflicts squarely and inherently with the right to a fair trial.

Courts attempting to implement *Faretta* have been confronted with this constitutional conflict. In the absence of any guidance from the Supreme Court as to how to resolve the contradictory demands posed by the Fifth Amendment guarantee of a fair trial and the Sixth Amendment right to self-representation, courts have simply assumed that the defendant who waives his right to counsel also implicitly waives his right to a fair trial. Some have made this assumption expressly. *See McDowell*, 814 F.2d at 251; *United States v. Moya–Gomez*, 860 F.2d 706, 740–41 (7th Cir.1988) (citing *McDowell* ). Others may have done so implicitly, *see* cases cited in the per curiam opinion *supra*, at 1101. These cases raise a number of questions that the Supreme Court has not yet confronted and that I believe require express resolution.

First, may a defendant waive his right to a fair trial? In other words, may he agree to a process that is likely to result in an unfair proceeding? To put it more bluntly, may he agree to an *unfair* trial? There is, as yet, no authority for the proposition that the Fifth Amendment right to a *fair* trial can be waived by a defendant. In my opinion, permitting waivers of the right to a *fair* trial would be contrary to the public interest. The *Faretta* majority remarked that the defendant should be permitted to waive his right to counsel because "it is he who suffers the consequences if his defense fails." 422 U.S. at 819–20, 95 S.Ct. 2525. The same is not true, however, of the waiver of the right to a fair trial. The right to a fair trial implicates the "institutional interests" of the judicial system, *see Wheat*, 486 U.S. at 160,, 108 S.Ct. 1692 as well as the interests of the defendant. It is, thus, not only the defendant, who "suffers the consequences" when a fair trial is denied, but the justice system itself. Put another way, the state has a compelling interest, related to its own political legitimacy, in ensuring both fair procedures and reliable outcomes in criminal trials, both of which objectives may be thwarted when a pro se defendant

2. *See* Barry C. Feld, *The Right to Counsel in Juvenile Court: Empirical Study of When Lawyers Appear and the Difference They Make*, 79 J. Crim., L. & Criminology 1185 (1989). Feld found that "the majority of states allow juveniles to waive their miranda rights as well as their right to counsel in delinquency proceedings without an attorney's assistance." Moreover, the study revealed the disturbing fact that juvenile court judges frequently badgered children as young as 12 into waiving their constitutional right to a lawyer and punishing those who refused. One commentator also noted the problem posed by the fact that children as young as 14 have the right to waive counsel even when being tried as adults for serious felonies. Note, *The Sixth Amendment Paradox: Recent Developments on the Right to Waive Counsel Under Faretta*, 23 New Eng. J. on Crim. & Civ. Confinement 559, 592 (1997).

3. *See Peters v. Gunn*, 33 F.3d 1190 (9th Cir. 1994) (holding that trial court erred in considering the fact that the defendant could not read in refusing to allow him to proceed pro se).

4. For one commentator, even these cases do not go far enough in promoting the defendant's "dignity" and "self-determination." She argues that Faretta should allow a defendant to proceed with *lay* counsel, arguing that the logic of *Faretta* is limitless. In her estimation, if a defendant is entitled to waive his greater right to counsel, he must therefore be entitled to waive the lesser right to *legal* counsel. *See* Mindy Block, *The Criminal Defendant's Sixth Amendment Right to Lay Representation*, 52 U. Chi. L.Rev. 460, 469 (1985) ("The only difference between Faretta and the lay-representation case is that, instead of appearing pro se, the defendant in the latter case chooses a third party to act in his stead. The interests in dignity and autonomy that support the defendant's right to appear pro se also support the right of a defendant to the assistance of lay counsel.").

like Farhad seeks to offer his "more glorious kind of a defense." In *Wheat,* the Court, per Chief Justice Rehnquist, emphasized institutional concerns when it held that the need to ensure the *appearance* of fairness was sufficient to warrant a refusal to permit a defendant to waive a Sixth Amendment right. 486 U.S. at 160, 108 S.Ct. 1692 ("Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized"). How much more inappropriate is a waiver when it is fairness itself, not mere appearance, that is at stake? Others may differ with the view that the right to a *fair* trial may not be waived. Some may argue that the due process clause requires only that the individual be afforded the opportunity to have a fair trial and that he may waive that right, just as he may waive other constitutional protections. The answer, however, must come from the Supreme Court and not from us. In my view, whatever that answer may be, it should be given before too many more trials like Farhad's take place in our federal courts.

Second, even if the Fifth Amendment right to a fair trial may be waived by individual defendants, there is a substantial question as to whether that right may be waived by implication, as occurred here. In my view, the waiver of a fundamental constitutional right should not be *implied,* as the Sixth Circuit appeared to conclude was proper in *McDowell,* and as courts generally appear to believe is required by *Faretta.* Waivers of constitutional rights are disfavored, and the courts indulge in every reasonable presumption against them. *See Brewer v. Williams,* 430 U.S. at 404, 97 S.Ct. 1232. In cases where the validity of a waiver of a constitutional right is at issue, the government has the burden to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. 1019. Ordinarily, a waiver must be knowing, intelligent, and voluntary in order to be valid. *See United States v. Duarte–Higareda,* 113 F.3d 1000, 1002 (9th Cir.1997) (waiver of right to trial by

jury must be in writing, accepted by the government and the court, and voluntary, knowing, and intelligent). Particularly in the case of the right to a fair trial—a right that is absolutely critical to the existence of due process itself—waiver by implication would appear highly inappropriate. Again, however, this is a question that the Supreme Court will have to determine, should it first decide that the right to a *fair* trial is subject to waiver at all.

To acknowledge that the *Faretta* right and the right to a fair trial are in tension is not to say that the right to self-representation must be eliminated altogether. The defendant's dignitary interests are important and are entitled to protection. They are not, however, paramount. The right to self-representation must be *balanced,* like the right to waive conflict free counsel in *Wheat,* or the right to a public trial in *Estes,* against the Due Process Clause's fundamental, guarantee that trials will be reliable, just, and fair. Surely if the right to a fair trial is compelling enough to justify the Court's previous limitations on Sixth Amendment rights, it is compelling enough to limit, in appropriate cases, the Sixth Amendment right at issue here. As with most other individual rights, there are competing and countervailing interests, both personal and social. Nothing inherent in the implied right of self-representation justifies exalting that right over all others in the constitutional constellation, or requires the courts to permit Farhad and others with similar limitations or incapacities to turn criminal trials into travesties. Rather, courts can develop rules for determining when the exercise of the right to self-representation would be consistent with the mandate of the Fifth Amendment, and when it would not. In the latter case, the right to self-representation would give way. Again, however, the adoption of such a regime is for the Supreme Court to determine, not a lower court.

For the above reasons, I concur specially, in the hope that the Supreme Court will

decide to reconsider *Faretta* and the line of cases implementing it.