(Nos. 85084, 86926 cons.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT SIMPSON, Appellant.

*Opinion filed September 27, 2001.*

FREEMAN, J., joined by McMORROW, J., specially concurring.

HARRISON, C.J., and KILBRIDE, J., dissenting.

Stephen E. Eberhardt, of Tinley Park, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FITZGERALD delivered the opinion of the court:

Defendant, Robert Simpson, appeals the orders of the circuit court of Cook County, dismissing his amended post-conviction petition and his petition for post-judgment relief. Defendant was sentenced to death for his underlying murder conviction; therefore, his appeal lies directly with this court. See 134 Ill. 2d R. 651(a). We affirm the circuit court's orders.

## BACKGROUND

Defendant's convictions arose from the armed robbery and murder of Barbara Lindich at the Fairway Food store in Glenwood, Illinois. This court has previously set forth the evidence presented at defendant's trial in our opinion on defendant's direct appeal. *People v. Simpson,* 172 Ill. 2d 117 (1996). For this reason, we will discuss only the facts that are necessary to the disposition of the issues raised in this appeal.

On May 22, 1992, at approximately 10 a.m., defendant and Carolyn LaGrone entered the Fairway Food store and robbed it while Lurlarn Young waited in the car. As defendant emptied the cash register, Barbara Lindich, a store customer, walked up behind LaGrone and peered over her shoulder. Defendant turned and shot Lindich, who later died as a result of the gunshot wound. Defendant then checked the safe, left the store with LaGrone and went to the car where Young awaited.

LaGrone was arrested three days later and gave a statement to the police that detailed the offense as well as Young and defendant's involvement. Defendant was thereafter arrested and placed in a lineup. He was identified by eyewitnesses, including employees at the Fairway Food store, as the man they saw rob the store and shoot Lindich.

At trial, three store employees identified defendant as the man who was behind the service desk with the gun. Forensic testing experts stated that the cartridge case recovered from the scene was fired from one of the pistols recovered from defendant's storage locker after defendant was arrested.

During all phases of the pretrial and trial proceedings, defendant represented himself with the aid of a public defender acting as standby counsel. Defendant called several witnesses who were present in the store at the time of the robbery to testify on his behalf. No defense witnesses contradicted the State's witnesses' ac-

counts of what occurred in the store. Defendant also called codefendant Young to testify but she invoked her fifth amendment right and did not testify. At defendant's request, and against the trial court's advice, custodial statements of LaGrone and Young were published to the jury.

At the close of the evidence, the jury returned a verdict finding defendant guilty of armed robbery and first degree murder of Lindich. The jury found defendant eligible for death on the basis of the murder-in-the-course-of-felony aggravating factor (720 ILCS 5/9—1(b)(6) (West 1992)) and the matter proceeded to the second stage of sentencing. Defendant continued to represent himself during the sentencing phase.

The trial court inquired whether defendant intended to call any witnesses on his behalf in mitigation and defendant responded that he wanted to call Judges James Bailey, Richard Fitzgerald and Lloyd Van Duzen as character witnesses. The trial court instructed defendant's standby counsel to investigate the matter and find out where the judges were currently located and if they could recollect knowing defendant.

At the next court date, the trial court provided defendant with three transcripts defendant had previously requested. The trial judge further informed defendant that he had contacted Judges Fitzgerald and Bailey and that neither judge remembered defendant. However, the trial court also informed defendant that both judges would be willing to come to court.

Defendant informed the trial court that since the judges could not remember him, he wanted to go to the law library and prepare certain motions. The trial court admonished defendant that he should be more concerned because the jury had not made a final determination as to defendant's sentence. In response, defendant countered that if the worst-case scenario occurred and he was

sentenced to death, that sentence would allow him to "bypass the Illinois Appellate Court" and go "directly to the Illinois Supreme Court." The trial court stated, "[Y]ou have your own strategy and I have told you this before, but I still wouldn't give up on the jury." Defendant acknowledged the statement but again affirmed his decision: "I understand, your Honor, but the law indicates if that does occur, the matter goes directly to the Supreme Court."

As a last attempt to convince defendant to reconsider his strategy, the trial judge informed defendant that if he were in defendant's position he would vigorously present mitigation evidence to the jury so that it would be inclined *not* to sentence defendant to death. Defendant asked if he could have some time to contact the judges himself. When court resumed, defendant informed the trial court that after speaking to Judge Bailey, the judge could not recall defendant. The judge again admonished defendant that he should not hinge his strategy on post-trial motions or on an appeal. He also explained to defendant that if one person on the jury panel disagreed with the imposition of death, defendant would not be sentenced to death. Despite the trial court's admonishments, however, defendant decided not to present any mitigation evidence.

At the conclusion of the second stage of the sentencing hearing, the jury found no mitigating factors to preclude imposition of the death penalty. The trial court appointed counsel to represent defendant on his post-trial motion. In preparation for the post-trial hearing, counsel requested defendant's medical file from the Pontiac Correctional Center, which showed that defendant suffered from headaches, dizziness, fainting spells, and bad eyesight and had survived a gunshot wound to the head from a prior incident. At the post-trial hearing, counsel argued that defendant was not competent to

represent himself during either the trial or the sentencing phase. The trial court denied the post-trial motion and sentenced defendant to death for the murder and 30 years' imprisonment for the armed robbery.

On direct appeal, this court affirmed defendant's conviction and sentence. *People v. Simpson*, 172 Ill. 2d 117 (1996). The United States Supreme Court denied *certiorari*. *Simpson v. Illinois*, 519 U.S. 982, 136 L. Ed. 2d 334, 117 S. Ct. 436 (1996). Thereafter, defendant filed a *pro se* petition for post-conviction relief and a motion to appoint counsel. Counsel filed a motion to produce handwritten statements from the Glenwood police department. The trial court ordered the Glenwood police department to produce the requested documents. After records were produced, counsel filed a motion to compel complete production of the documents and a motion to take depositions. The trial court denied the motions.

Prior to the initial court date on defendant's post-conviction petition, the State filed a motion for clarification of defendant's competence pursuant to *People v. Owens*, 139 Ill. 2d 351 (1990). The State requested that the trial court determine if defendant had raised a *bona fide* issue as to his competence. The trial court determined that defendant's condition had not deteriorated and that he was coherent and able to understand the proceedings.

Thereafter, the trial court dismissed defendant's post-conviction petition without an evidentiary hearing. Defendant then filed a *pro se* petition for post-judgment relief. 735 ILCS 5/2—1401 (West 1998). The trial court dismissed the petition for post-judgment relief and defendant appealed directly to this court. We consolidated both matters for purposes of this appeal. We affirm the trial court's dismissal of defendant's post-conviction petition and the dismissal of defendant's petition for post-judgment relief for the following reasons.

## ANALYSIS

In a post-conviction proceeding, the trial court does not redetermine a defendant's innocence or guilt, but instead examines constitutional issues which escaped earlier review. See *People v. Evans*, 186 Ill. 2d 83, 89 (1999). To be entitled to post-conviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 through 122—7 (West 1998)), a defendant must demonstrate a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged conviction or sentence. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999).

A basic tenet of the Act is that the scope of post-conviction relief is limited by considerations of waiver and *res judicata* "to constitutional matters which have not been, and could not have been, previously adjudicated." *People v. Winsett*, 153 Ill. 2d 335, 346 (1992). Issues that could have been raised on direct appeal, but were not, and any issues that were decided by a reviewing court generally will not be considered in a post-conviction proceeding. *People v. West*, 187 Ill. 2d 418, 425 (1999).

At the second stage of a post-conviction proceeding, as in the present case, the circuit court appoints counsel to represent an indigent defendant and counsel may file an amended post-conviction petition. See 725 ILCS 5/122—4 (West 1998); *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). The State may then file a motion to dismiss or answer the defendant's post-conviction petition. 725 ILCS 5/122—5 (West 1998). A defendant is not entitled to an evidentiary hearing on his post-conviction petition as a matter of right. *People v. Whitehead*, 169 Ill. 2d 355, 370-71 (1996).

An evidentiary hearing on a post-conviction petition is warranted only where the allegations of the petition, supported by the trial record or accompanying affidavits where appropriate, make a substantial showing that a

defendant's constitutional rights have been violated. *Morgan*, 187 Ill. 2d at 528; *People v. Towns*, 182 Ill. 2d 491, 503 (1998). All well-pleaded facts in the petition and accompanying affidavits, if any, are taken as true for the purpose of determining whether to grant an evidentiary hearing. *People v. Brisbon*, 164 Ill. 2d 236, 244-45 (1995).

This court reviews a trial court's determination regarding the sufficiency of allegations in a post-conviction petition *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998). With these basic principles in mind, we turn to defendant's first contention.

I. Errors at Post-Conviction Proceeding

Before considering the allegations raised in defendant's post-conviction petition, we first consider defendant's contention that the trial court erred during the post-conviction proceeding when it failed to grant defendant's discovery request, improperly made certain factual and credibility determinations, and ruled that defendant was competent to proceed with the post-conviction process.

Defendant maintains that the post-conviction court erred in denying his request for the discovery depositions from four witnesses who wrote out information after the incident at the request of one of the police officers, Sergeant DiMare. Defendant alleges that there exists a conflict between DiMare's trial testimony as to what he told the four witnesses to write down after the incident, an affidavit that DiMare prepared for the post-conviction proceeding, and the witnesses' own testimony.

At trial, all four witnesses testified that DiMare gave them pencil and paper and requested that they write out notes about the incident. DiMare testified that he gave all of the witnesses pencils and paper so that they could write out notes about the incident. In an affidavit DiMare prepared for the post-conviction proceeding, he stated that the statements he received contained general

information about the crime, which he incorporated into the police report. He further stated that the notes were destroyed once the police report was completed. Defendant argues the trial court should have ordered discovery depositions from the four witnesses in order to ascertain what their statements actually contained.

Although neither the civil nor the criminal discovery rules apply to post-conviction proceedings, a circuit court nonetheless has inherent discretionary authority to order discovery in post-conviction proceedings. *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 183 (1988); *People v. Fair*, 193 Ill. 2d 256, 264 (2000). A circuit court should allow discovery only if the moving party has demonstrated "good cause" for the discovery request. *Fair*, 193 Ill. 2d at 264-65. A discovery request will be denied where it amounts to a "fishing expedition." *People v. Enis*, 194 Ill. 2d 361, 415 (2000). A circuit court's denial of a request for discovery in a post-conviction proceeding will not be reversed absent an abuse of discretion. *Fair*, 193 Ill. 2d at 265.

Upon review, we find that the trial court did not abuse its discretion in denying defendant's discovery requests. Despite defendant's contention to the contrary, the conflict between DiMare's testimony and his affidavit is not apparent from the record. The witnesses testified that DiMare asked them to write down information about the incident and that he provided pencils and paper for them to do so. Similarly, DiMare testified that he told the witnesses to write down their names and addresses "and if they had anything that they want to keep a note of they could." In his affidavit, DiMare stated, "I asked the witnesses to write their names, addresses, telephone number, where they were in the store at the time of the shooting, and other such information, on a piece of paper." There is no inconsistency between these two statements, nor has defendant demonstrated that there

existed a good cause for the trial court to order discovery depositions of the four witnesses. As such, the trial court did not abuse its discretion in denying the request.

Defendant next maintains that the circuit court incorrectly made findings of fact and determinations of credibility regarding *Brady* material and the testimony of LaGrone. We find defendant's argument as to both contentions unpersuasive.

In his post-conviction petition, defendant argued that DiMare deliberately withheld statements that were given to him by four witnesses. Defendant argues that in reaching its determination to dismiss defendant's petition, the trial court made improper factual and credibility findings. The record shows, however, that the trial court simply restated the contents of DiMare's affidavit.

We note that in restating the contents of the affidavit, the trial court incorrectly used the term *res judicata* instead of waiver. This error, however, is *de minimis*. It is clear from the trial court's order that the dismissal rested on the fact that the *Brady* violation could have been brought up on direct appeal and was, therefore, waived. In reaching this conclusion, the trial court did not make any factual or credibility determinations.

Defendant further contends that the trial court made factual findings as to his allegation that LaGrone was instructed by the State to lie about her drug usage on the day of the arrest. The trial court noted that although defendant attached an affidavit from an investigator stating that LaGrone told him she was instructed to lie, defendant did not submit an affidavit from LaGrone herself. The trial court also noted that during the trial LaGrone was extensively cross-examined about her drug use. She denied that she used drugs on the day of her arrest but admitted that she was a drug user and was receiving treatment for her drug addition. Thus, the trial court properly concluded that defendant's allegations lacked legal sufficiency.

Defendant's final argument concerns his competency to proceed with the post-conviction proceedings. The record shows that upon the State's request, the trial court made an initial determination of whether a *bona fide* doubt existed as to defendant's competency. See *People v. Owens*, 139 Ill. 2d 351 (1990). The trial judge decided the issue after hearing arguments from the defendant, defendant's post-conviction counsel and the prosecutor. The trial court concluded,

"This court listened to the petitioner at length and heard the various legal arguments he advanced as to why a psychiatric examination should not be ordered. This court also listened to petitioner's appointed counsel and arguments advanced by the assistant state's attorney. It is clear to this court that petitioner's condition had not deteriorated and that he is coherent and able to understand the proceedings."

A defendant is presumed to be fit to stand trial, to plead, and to be sentenced. 725 ILCS 5/104—10 (West 1998). A defendant is also presumed to be fit at the time of post-conviction proceedings. *Owens*, 139 Ill. 2d at 362. When a *bona fide* doubt of a defendant's fitness to proceed with post-conviction proceedings is raised, the court may order a psychological evaluation of the defendant and consider the matter at an evidentiary hearing. *Owens*, 139 Ill. 2d at 365.

Because the trial court is in the best position to observe a defendant's conduct, whether a *bona fide* doubt of fitness to proceed exists is a matter that lies within the discretion of that court. *People v. Johnson*, 191 Ill. 2d 257, 269 (2000). A defendant is considered unfit to proceed with the post-conviction process when, because of a mental condition, he cannot communicate his allegations of constitutional deprivations to counsel, thus frustrating his entitlement, under the Act, to a reasonable level of assistance. *Johnson*, 191 Ill. 2d at 269, citing *Owens*, 139 Ill. 2d at 359-65. If a defendant is competent

to communicate allegations of constitutional violations to counsel, that defendant is competent to participate in post-conviction proceedings.

Here, the circuit court found that no *bona fide* doubt of defendant's fitness existed. In fact, the trial court noted that the differences between defendant and his post-conviction counsel centered around legal matters and procedures. This conflict about legal strategy does not rise to the level of mental incompetency on defendant's part. The trial court further found that defendant's mental condition had not deteriorated since the last court date and that defendant's post-conviction counsel was able to incorporate some of defendant's *pro se* arguments into the amended petition. All of these factors together demonstrate that the trial court did not abuse its discretion in ruling that defendant was competent to proceed with the post-conviction proceedings.

## II. Use of Perjured Testimony

We now consider the allegations of defendant's post-conviction petition. Defendant first claims that Sergeant DiMare, "in a calculated effort to convict" defendant, presented false testimony to the grand jury, at hearing on defendant's motion to suppress and at trial. Before reaching the merits of defendant's perjury claims, however, we must address the State's contention that review of these claims was forfeited when defendant failed to raise them on direct appeal. A post-conviction petition is a collateral attack upon a prior conviction and sentence, not a substitute for or an addendum to a direct appeal. *People v. West*, 187 Ill. 2d 418 (1999). Consequently, any issues which could have been raised on direct appeal are forfeited. *West*, 187 Ill. 2d at 425.

We agree with the State that defendant's claim as to DiMare's grand jury testimony, his testimony at the suppression hearing and his testimony at trial were all contained in the record on direct appeal. As such, each of

these claims could have and should have been raised on direct appeal. See *West*, 187 Ill. 2d at 425. Thus, these claims are waived.

The application of the waiver rule is not, however, a jurisdictional or absolute bar to review of procedurally defaulted claims, but is rather a rule of administrative convenience. *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996); see also *People v. Owens*, 129 Ill. 2d 303, 317 (1989). Thus, the strict application of waiver will be relaxed " 'where fundamental fairness so requires.' " *Whitehead*, 169 Ill. 2d at 371, quoting *People v. Gaines*, 105 Ill. 2d 79, 91 (1984). In order to satisfy the requirements of invoking the fundamental fairness exception, the defendant must satisfy a "cause and prejudice" test by objectively showing that defense counsel's efforts to raise the claim on direct review were impeded *and* that the error so infected the entire trial that the defendant's conviction violates due process. *People v. Franklin*, 167 Ill. 2d 1, 20 (1995); see also *People v. Mahaffey*, 194 Ill. 2d 154, 173 (2000). We find that defendant has failed to satisfy either prong of this "cause and prejudice" test and has failed, thus, to show that the fundamental fairness exception should be invoked.

It is well established that the State's knowing use of perjured testimony in order to obtain a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). A conviction obtained through the knowing use of perjured testimony must be set aside. *Olinger*, 176 Ill. 2d at 345, citing *United States v. Bagley*, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985). Where the State allows false testimony to go uncorrected, the same principles apply. *Olinger*, 176 Ill. 2d at 345. However, the State's obligation to correct false testimony does not amount to an obligation to impeach its witnesses with any and all evidence bearing upon their credibility. *People v. Pecoraro*, 175 Ill. 2d 294, 312-14 (1997).

Contrary to defendant's claim, we find no evidence in the record that DiMare committed perjury. Defendant first argues that DiMare presented false testimony when he stated to the grand jury that defendant used a gun to strike Katherine Koszut but that in his report he stated that he was told that defendant hit her with his other hand. The record, however, fails to support this claim. DiMare's report states,

"Mrs. Koszut asked the black man if she could help him at which time he held up what she thought to be a paper with a barrel of a gun sticking out, and said 'this is a stick up.' \*\*\* [T]he suspect then grabbed Mrs. Koszut by the back collar of her shirt and with his other hand struck her in the rear of the head driving her to the floor of the service booth."

The statement that defendant hit Koszut "with his other hand" does not distinguish whether that was the hand that held the gun or not. Thus, this statement does not contradict DiMare's testimony that defendant hit Koszut with the gun. Moreover, as the State points out, even if DiMare incorrectly testified that defendant hit Koszut with the gun, the aggravated battery and armed violence counts stemming from this action were dismissed by the State prior to jury selection. Thus, because the jury never heard the allegedly false testimony and did not know of the armed violence and aggravated battery counts, its verdict would not have been affected.

Defendant also claims that DiMare gave false testimony at the hearing on the motion to suppress when he testified that one of the witnesses, Helen Gair, identified defendant at a lineup. The State counters that defendant fails to show the falsity of DiMare's statement at the suppression. However, Gair's affidavit, attached to the petition, states that she could not positively identify anyone at the police lineup and that she informed the police of this fact.

Nonetheless, defendant does not show that his convic-

tion was obtained through the knowing use of perjured testimony. The record shows that at trial Gair did not testify. Instead, defendant and the State agreed upon two stipulations concerning Gair's testimony. Notably, there is no mention of any pretrial identification or lack of identification in either of these two stipulations, nor is there any indication that DiMare testified at trial regarding the pretrial identification. The jury was never made aware of any pretrial identification as far as Gair was concerned. Thus, assuming the falsity of DiMare's testimony at the motion to suppress hearing, this testimony did not impact the jury's verdict at trial.

Defendant further claims that DiMare falsely testified as to what he asked the four witnesses to write down at the time of the incident. Defendant argues that DiMare's testimony varies with his statement in the affidavit. As stated earlier in this opinion, however, there is no significant variance between DiMare's testimony and his affidavit. The gist of DiMare's statement to the four witnesses was the same at both the trial and in his affidavit.

Finally, defendant claims that DiMare committed perjury when he "implied to the jury" that Kimberly Knight, an occurrence witness, had described defendant as the offender. The record shows that defendant called DiMare during his case in chief and asked DiMare if he wrote down Knight's description of the offender in the supplemental report or in any report. DiMare answered, "None that I recall." Upon further questioning by defendant, DiMare stated, "[W]e [the police] come up with a physical description after talking to all of the witnesses."

Defendant's argument that DiMare improperly "implied" that Knight's description of the offender matched defendant's description is not supported by the record. In fact, the nature of defendant's questions implied that DiMare did not conduct a full and complete

investigation and did not write down all of the information that the various witnesses, including Knight, had given him.

In sum, defendant's allegations that the state knowingly used perjured testimony are not supported by the record and his claim of a due process violation fails.

### III. *Brady* Violation

Defendant further contends that the State committed prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). We note that defendant incorporates the same perjury claims previously discussed in addition to raising new claims. Specifically, defendant claims *Brady* violations existed where (1) DiMare presented false testimony to the grand jury; (2) defendant was not advised that Gair had been hypnotized in an effort to enhance her memory of the events she alleged in her affidavit; (3) DiMare's affidavit and his trial testimony differ as to what he asked the witnesses to write down at the time of the incident; (4) DiMare's testimony implied that Knight had described an offender that was defendant; and (5) the State failed to tender interview notes and a tape of a witness statement made to an investigator regarding the occurrence.

The general rule, as set forth in *Brady*, provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. A defendant is not entitled to relief under *Brady*, however, unless he can establish that the evidence improperly withheld was both favorable to the defense and material.

Evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). A reasonable probability that the result of the proceeding would have been different is a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383; *People v. Page*, 193 Ill. 2d 120 (2000).

In the present case, defendant's claims, together or separately, do not establish a constitutional violation. We briefly review each of the claims raised. With regard to defendant's first claim that DiMare committed perjury before the grand jury regarding Koszut's statement, as previously noted, we find no evidence in the record to indicate that DiMare committed perjury. Nonetheless, even if defendant's allegations were supported by the record, the record makes clear that the armed violence and aggravated battery counts stemming from defendant's act of striking Koszut with a gun were dismissed by the State. Thus, there is no reasonable likelihood that the allegedly false testimony could have affected the jury's verdict. See *Olinger*, 176 Ill. 2d 326.

Next, defendant claims that he was not informed that Gair was hypnotized to assist her memory of the events. Defendant fails, however, to explain how this information would have been material to the defense. Aside from simply stating that evidence of the hypnosis was withheld from him, defendant fails to articulate any reason as to how these factors establish *Brady* violations. Gair did not personally testify at the trial nor did she identify defendant. The only evidence concerning Gair came in through two stipulations, neither of which involves identification of defendant by her, with hypnosis or without hypnosis. Defendant does not show how this information, had it been disclosed to the defense prior to trial, would have yielded a different result in the proceeding.

Defendant's next two assignments of error concern DiMare's request of four witnesses to write down information about the incident. We will not revisit this argument, as we already found that the record does not show there exists a discrepancy between DiMare's testimony and the information contained in his affidavit.

Defendant next argues that DiMare committed perjury when he intimated to the jury that Kimberly Knight described an offender that was the defendant. Contrary to defendant's claim, however, we find no evidence in the record that DiMare committed perjury because, according to defendant, he "implied" that Knight described an offender that was the defendant. Once again, defendant has failed to articulate a legitimate *Brady* violation and has failed to show how this "implication," even if true, affected the jury's verdict.

Finally, defendant argues that the State committed a *Brady* violation when it failed to tender interview notes and a tape of a witness statement from Kimberly Knight made to an insurance investigator. With reference to the interview notes, it appears that defendant is again raising the issue of the notes from the four witnesses written at DiMare's request. DiMare stated that he combined the contents of the four witnesses' notes in the police report he generated before destroying the notes. DiMare was further extensively cross-examined about the notes, their content and the fact that they were later destroyed. Defendant has failed to show that there is a reasonable probability that a different outcome would have resulted had defendant had the notes from the four witnesses.

Defendant also argues that the State committed a *Brady* violation by failing to tender to defendant a tape of Knight's statement made to an insurance investigator regarding the incident.

Defendant maintains that with the statement he would have been able to show the inconsistencies in the

testimony of other witnesses and that, as a result, the proceedings would have been different. Defendant's argument, however, is unpersuasive.

At trial, during cross-examination by defendant, defendant questioned Knight as to the amount of money that was missing after the robbery. Knight replied, "I don't know the exact dollar figure. You would have to meet with the insurance adjuster." She further stated that an insurance adjuster spoke to her and taped the conversation of what happened in the store on the day of the robbery for insurance purposes. At the hearing on defendant's post-trial motion, defendant argued the issue of the missing insurance adjuster tape interview along with various other *Brady* claims. Defendant requested that the tape be located and subpoenaed. The trial court directed the State to locate the tape if it still existed. On February 15, 1994, the State tendered a transcript of an interview of Kimberly Knight conducted on June 8, 1992, by an insurance investigator.

Initially, we note that it is clear that the issue of the taped interview is one that was raised both during trial and in the post-trial motion. As such, this issue should have been raised on direct appeal and is therefore waived. Although the objective of finality must yield in circumstances where fundamental fairness so requires (*Whitehead*, 169 Ill. 2d at 369), in this case, defendant has failed to satisfy the "cause and prejudice" test that will excuse a defendant's procedural default. See *People v. Flores*, 153 Ill. 2d 264 (1992).

Defendant has failed to establish how the taped conversation, by a person who was not an agent of the State, was both favorable to the defense and material. Although defendant characterizes the State's failure to tender the tape as egregious, defendant completely fails to articulate how the taped interview would have helped his case. He does not state which witnesses, if any, would

have been impeached by this taped interview or how the result of the proceedings would have been any different had this information been known and made available to defendant during trial. Once the existence of the tape was disclosed, the State made efforts to locate it and tender it to defendant. There is no evidence in the record to suggest that the State knew of, or should have known of, the existence of the tape until Knight testified.

In essence, defendant creates a laundry list of perceived errors but fails to show how these alleged errors would have undermined confidence in the outcome of the trial. As such, defendant has failed to establish a *Brady* violation with regard to any of the above evidence.

IV. Waiver of Right to Counsel

Defendant next maintains that he did not knowingly and voluntarily waive his right to counsel at trial and sentencing and argues that he was not competent to proceed *pro se* during trial or during post-conviction proceedings. In support of these arguments, defendant attaches affidavits in his post-conviction petition from three mitigation specialists and three psychologists who, in essence, state that defendant's demeanor and conduct is consistent with some type of mental defect—most likely, attention deficit disorder or attention deficit disorder with hyperactivity.

On direct review, this court addressed defendant's competency to represent himself at trial. A post-conviction petitioner may not avoid the bar of *res judicata* simply by rephrasing, as defendant has done in this case, issues previously addressed on direct appeal. *People v. Williams*, 186 Ill. 2d 55, 62 (1999); *People v. Franklin*, 167 Ill. 2d 1, 23 (1995); *People v. Emerson*, 153 Ill. 2d 100, 106-07 (1992).

Defendant concludes that the affidavits show that "the trial court simply did not adequately address trial competency and competency to waive the right to

counsel." This precise issue, however, was raised before this court on direct appeal. This court stated,

"The record indicates the defendant was literate, responsive and understanding. Defendant, age 39, had an extensive criminal history. He had demonstrated a familiarity with the judicial process and, according to the trial judge, had waived counsel and represented himself on a prior occasion. Further, defendant filed numerous motions and actively presented his defense. He demonstrated, in the words of the trial judge, that '[he] knew what he was doing' when he waived his right to counsel and chose to represent himself." *Simpson*, 172 Ill. 2d at 134.

This court carefully considered and rejected each of defendant's claims after a lengthy analysis. We concluded that defendant was competent to represent himself at trial and sentencing and that his decision to waive the right to counsel was knowingly and voluntarily made. *Simpson*, 172 Ill. 2d at 134. Therefore, we hold that defendant's claim that he was not competent to waive the right to counsel is barred by *res judicata*.

Nonetheless, defendant maintains that the affidavits from the experts are new evidence that show there was a legitimate doubt as to defendant's mental capacity to participate in the proceedings. As such, argues defendant, the limitation of *res judicata* does not apply.

Guided by principles of fundamental fairness, a court will relax the customary doctrine of *res judicata* when appropriate. *People v. King*, 192 Ill. 2d 189, 193 (2000); *People v. Neal*, 142 Ill. 2d 140, 146 (1990). However, the fundamental fairness exception will not be applied where the defendant has failed to meet the requirements of the "cause and prejudice" test. In this case, defendant has failed to establish that the alleged error so prejudiced him that his conviction violates due process. See *Franklin*, 167 Ill. 2d at 15; see also *Mahaffey*, 194 Ill. 2d at 173.

For new evidence to be sufficient to warrant a new trial, it must be of such conclusive character that it will probably change the result upon retrial. *People v. Patter-*

*son*, 192 Ill. 2d 93, 124 (2000); *People v. Hobley*, 182 Ill. 2d 404, 449 (1998). Furthermore, evidence must be material and not merely cumulative. *People v. Molstad*, 101 Ill. 2d 128, 134 (1984). It must also be discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. *Molstad*, 101 Ill. 2d at 134.

Assuming that the evidence from the experts is new evidence, we conclude, nonetheless, that the affidavits are not of such conclusive character that they would change the result upon retrial. See *Hobley*, 182 Ill. 2d at 449. At most, the experts agree that defendant may suffer from an attention deficit disorder. Notably, only one of the experts stated that defendant's decision to "waive" his right to counsel resulted from a compulsion rather than an intelligent decision and that his ability to defend himself was impaired. The other experts stated that defendant's mannerisms and speech were consistent with attention deficit disorder, impulsive decisionmaking and "poor judgment."

All of the experts also agreed that defendant was uncooperative during the interviews, thus inhibiting a full evaluation. In addition, none of the experts reviewed the transcripts in this case in reaching a decision as to defendant's competence. As we stated in the direct appeal, defendant actively participated in his defense from the time of jury selection all the way through to the sentencing phase. These are factors that were not considered by the experts in reaching their determination. We find that the fundamental fairness exception to *res judicata* need not be applied, as defendant cannot establish that he suffered prejudice.

Defendant also claims that he was not competent to proceed during the post-conviction proceeding. Despite defendant's assertion, however, the record shows that upon the State's request, the trial court carefully

determined whether there was a *bona fide* doubt of defendant's competency to proceed with the post-conviction proceedings at a hearing. For the reasons articulated earlier in this discussion, the trial judge did not abuse his discretion in finding defendant competent to proceed with the post-conviction proceedings.

V. Ineffective Assistance of Counsel

Defendant's next contention reduces itself to a question of whether standby counsel was ineffective in aiding defendant during the trial. Specifically, defendant contends that counsel failed to adequately investigate the existence of possible mitigation evidence and that appellate counsel failed to raise an ineffectiveness claim on appeal.

At the outset, we note that the crux of defendant's argument is that an attorney acting as standby counsel for a capital defendant has a higher duty to aid that defendant during the trial and sentencing phase. Defendant urges this court to extend the duties of standby counsel to encompass preparation of a legal defense and mitigation even when the defendant opts to assert his constitutional right to self-representation. We decline to adopt such a position.

The right of self-representation does not carry with it a corresponding right to legal assistance; one choosing to represent himself must be prepared to do just that. *People v. Gibson*, 136 Ill. 2d 362, 383 (1990). Standby counsel may assist a *pro se* defendant "in overcoming routine procedural or evidentiary obstacles to the completion of some specific tasks, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete" and may also help "ensure the defendant's compliance with basic rules of courtroom protocol and procedure." *McKaskle v. Wiggins*, 465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944 (1984). The trial court has broad discretion to appoint counsel for these

advisory or other limited purposes and to determine the extent and nature of standby counsel's involvement. *People v. Redd*, 173 Ill. 2d 1, 38 (1996).

In the direct appeal of this case, we discussed the extent of standby counsel's role in this case as one in which counsel would aid defendant during trial and assist him in investigating matters defendant believed would be necessary to his defense. Standby counsel's role, however, was not one of active participation in preparing or presenting defendant's legal defense nor was defendant under this belief. *Simpson*, 172 Ill. 2d at 136.

The trial court described the role of standby counsel and repeatedly admonished defendant that he could not proceed *pro se* and also be represented by counsel. The trial court further directed standby counsel to proceed at defendant's direction and perform certain *investigative* tasks. Defendant understood that standby counsel's role was to carry out an investigatory function as well as his regular standby duties.

Defendant claims that his standby counsel was ineffective for failing to investigate certain mitigation evidence. Claims of ineffective assistance of counsel are analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under *Strickland* a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the trial result would have been different. *People v. Alvine*, 173 Ill. 2d 273, 293 (1996). With regard to mitigating evidence, defense counsel has a duty to make a reasonable investigation into the mitigating evidence he will present at a defendant's capital sentencing hearing, or he must have a sound reason for failing to make a particular investiga-

tion. *People v. Morgan*, 187 Ill. 2d 500, 541 (1999). Nonetheless, courts reviewing trial counsel's decisions regarding the presentation of mitigating evidence are highly deferential. *People v. Towns*, 182 Ill. 2d 491, 513-14 (1998).

An informed decision by defense counsel, however, not to present certain mitigating evidence can be a valid strategic choice, entitled to judicial deference, where the evidence is potentially damaging to the defendant. *Towns*, 182 Ill. 2d at 514. Where the lack of mitigating evidence presented at a defendant's trial is not attributable to strategy, but instead to counsel's failure to properly investigate mitigating evidence and to prepare a defense, such deference is not warranted. *Towns*, 182 Ill. 2d at 514.

Here, as we pointed out in the direct appeal, counsel was not under a duty to actively participate in preparing defendant's legal defense. Rather, counsel was there for a limited purpose: to aid defendant in an investigatory capacity. *Simpson*, 172 Ill. 2d at 136-37. The responsibility of preparing a legal defense and mitigation remained on defendant throughout the trial and sentencing.

Defendant was informed by the trial court that he should be prepared to proceed with mitigation evidence at the sentencing hearing if he was found guilty. When the time came for mitigation evidence to be presented, defendant sought to call three judges to testify on his behalf. However, the judges were unable to remember defendant. The trial judge, at defendant's request, contacted each of the judges, on a few occasions. The trial court informed defendant that at least two of the three judges would be willing to come to court but that neither judge could remember defendant. Defendant contacted one of the judges himself, in an effort to help the judge remember him. Defendant also requested various transcripts from witnesses, all of which were provided for him.

During this time, the trial judge repeatedly advised defendant that he should present some other mitigation evidence in an effort to sway the jury not to impose death. Ultimately, defendant made a strategic choice not to present any mitigation evidence because, according to defendant, he wanted the case to be directly reviewed by this court should he receive the death penalty. The trial judge questioned defendant's prudence in choosing such a strategy, but the record shows that defendant was adamant in his decision. Thus, defendant chose not to present any mitigation evidence.

Defendant argues that standby counsel had received a medical file while preparing defendant's post-trial motion that disclosed that defendant suffered from frequent and severe headaches, dizziness, fainting spells, bad eyesight and an old gunshot wound to the head. Defendant suggests that this information, had it been presented during mitigation, would have yielded a different result. Defendant cannot, however, avoid the principle that a person proceeding *pro se* may not later complain that he received ineffective assistance of counsel. The duty to present mitigation evidence remained with defendant throughout the sentencing phase.

The record shows that defendant was familiar with the judicial process and that he actively sought information, such as transcripts, subpoenas and documents from the trial court in an effort to prepare for the aggravation/mitigation phase of sentencing. Defendant himself made the final determination not to present any mitigation evidence, despite the trial court's admonishment to the contrary. Nothing in either the record or defendant's brief suggests that defendant requested that standby counsel investigate additional mitigation evidence, such as defendant's medical file. Further, nowhere does defendant explain in what way the conduct of his standby counsel prevented him from introducing evidence in mitigation.

To succeed on a claim of this nature, defendant should be required to establish that the actions of standby counsel prevented defendant from accomplishing something he otherwise intended to accomplish or would have been able to accomplish if standby counsel had not prevented him from doing so, either through unreasonable advice or direct action. In other words, to prevail on an ineffectiveness claim, defendant should show how standby counsel's actions fell below an objective standard of reasonableness with respect to the level of guidance standby counsel was required to offer. To suggest otherwise would mean that standby counsel would have to do, in advance and without direction from the *pro se* defendant, additional preparation of the case in order to present this evidence to the defendant, who would then determine whether or not he would use it. This level of preparation is beyond the scope of a standby counsel's duty.

Here, defendant seeks to avoid the consequences of his decision to represent himself during the second stage of the sentencing hearing. As such, we decline to find that standby counsel's performance fell below an objective standard of reasonableness with respect to providing mitigation evidence to defendant.

Defendant further argues that appellate counsel was ineffective for failing to raise the ineffectiveness of standby counsel. Again, we reject this argument on the basis that defendant acted as his own counsel and standby counsel did not have an obligation to prepare defendant's case for him.

The two-prong *Strickland* test applies to claims of ineffective appellate counsel. *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989). A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating such a failure was objectively unreasonable and that counsel's

decision prejudiced defendant. *Enis*, 194 Ill. 2d at 377. If the underlying issue is nonmeritorious, the defendant has suffered no prejudice. *Enis*, 194 Ill. 2d at 377; *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Normally, appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *People v. Mack*, 167 Ill. 2d 525, 532-33 (1995).

In the present case, the underlying issue of the duty of standby counsel to prepare mitigation evidence has no merit. Therefore, defendant suffered no prejudice by the failure of his appellate counsel to raise this issue on direct appeal.

### VI. Constitutionality of Death Penalty Statute

In his last assignment of error defendant argues that the Illinois sentencing system is unconstitutionally applied. Defendant maintains that the Illinois statutory scheme impermissibly places a burden on the defendant unauthorized by the legislature.

In his direct appeal defendant raised a similar claim. Defendant argued that the death penalty statute violates the eighth amendment by providing for the death penalty where evidence in mitigation is not sufficient to preclude it. As such, according to defendant, the statute precludes a meaningful consideration of mitigating evidence.

Although defendant's claim in the amended post-conviction petition is framed slightly differently, the doctrine of *res judicata* still applies. As this court has emphasized, the Act was not intended to be used as a tool to gain access to another hearing upon a claim of denial of constitutional rights when there had already been a full review of this issue raised. *People v. Cox*, 34 Ill. 2d 66, 67-68 (1996). Defendant in this case cannot circumvent the purpose of the Act by framing the issue in different terms. Therefore, defendant's claim is barred by *res judicata*.

## VII. New Supreme Court Rules

In an effort to ensure the highest degree of legal competency in capital cases, we have formulated a comprehensive set of rules to govern death penalty cases. See 188 Ill. 2d Rs. 3.8, 43, 411, 412, 416, 417, 701, 714.

In April 1999, this court appointed a 17-member special committee on capital cases to assess the way the death penalty system is administered in Illinois. This committee was created as a forum for debate and the dissemination of constructive and critical comment regarding our criminal justice process. *In re* Special Supreme Court Committee on Capital Cases, M.R. 15833 (April 6, 1999).

The committee's goal was to research and identify the best procedures for enhancing the administration of justice in our capital cases. In October 1999, the committee issued its first report on its findings. It further conducted public hearings in Springfield and Chicago. Following the public hearings, the committee issued a new supplemental report containing its findings and recommendations. Central to its findings was a recommendation to establish a Capital Litigation Trial Bar.

The recommendation to establish the Capital Litigation Trial Bar was based on the committee members' unanimous finding that "reasonable, minimum standards for training and experience, consistently applied as a condition of trial bar admission, are the only way to ensure significant, systemwide improvement in the quality of advocacy in capital trials." 188 Ill. 2d R. 714, Committee Comments, at cxiii. The Capital Litigation Trial Bar was created to ensure that capital defendants receive fair and impartial trials and sentencing hearings, to minimize the occurrence of error to the maximum extent feasible, and to identify and correct with due promptness any error that may occur. 188 Ill. 2d R. 416 & Committee Comments, at lxxii.

Under the new rules, all defense counsel and as-

sistant prosecutors appearing as lead or co-counsel in capital cases must be members of the Capital Litigation Trial Bar. Attorneys who fail to meet the specific requirements may not appear in capital cases without receiving a waiver directly from our court. 188 Ill. 2d R. 714(d). Further, indigent defendants are entitled to be represented by two attorneys with the requisite qualifications. 188 Ill. 2d R. 416(d). Finally, mandatory educational programs are required for trial judges who may be called to preside over capital cases. 188 Ill. 2d R. 43.

Additionally, the new rules extend criminal discovery rules to capital sentencing hearings (188 Ill. 2d R. 411); impose on the State the duty to make a good-faith effort to identify material or information which tends to negate the guilt of the accused or reduce his punishment (188 Ill. 2d R. 412(c)); require the State to give notice of its intention to seek the death penalty (188 Ill. 2d R. 416(c)); authorize discovery depositions (188 Ill. 2d R. 416(e)); mandate case management conferences (188 Ill. 2d R. 416(f)); and impose new pretrial disclosure rules with respect to DNA evidence (188 Ill. 2d R. 417). The new rules also clarify the duty of prosecuting attorneys. Specifically, they state that "the duty of a public prosecutor or other government lawyer is to seek justice, not merely to convict." 188 Ill. 2d R. 3.8(a).

Although the court unanimously adopted the new rules, the dissents and majority disagree as to their effect on capital cases which were pending before this court at the time of adoption. Chief Justice Harrison, in his dissent, maintains that this court should automatically vacate all capital convictions that were obtained without the benefit of the new rules. To support this position, the Chief Justice makes two arguments. First, he contends that without the new rules, "no capital conviction or sentence can be deemed reliable." 204 Ill. 2d at 581 (Harrison, C.J., dissenting); *People v. Hickey*, 204 Ill. 2d 585,

634 (2001) (Harrison, C.J., dissenting). Further, because the new rules impose stringent standards on attorneys and judges regarding their qualification to participate in capital trials, the Chief Justice finds it untenable that a defendant, such as the one in this case, should be allowed to represent himself. Thus, the Chief Justice suggests (as does Justice Kilbride in his dissent) that in capital cases, pursuant to the new rules, this court should reject a defendant's right to self-representation because a *pro se* defendant can never meet the rigid standards set out in the rules. We disagree as to both points.

The Chief Justice would create a bright-line rule to vacate all convictions and sentences decided without the benefit of the new rules. 204 Ill. 2d at 581 (Harrison, C.J., dissenting); *Hickey*, 204 Ill. 2d at 636 (Harrison, C.J., dissenting). Such a rule would ignore the multitude of cases that were tried by competent attorneys, adjudicated by experienced judges and carefully reviewed on the merits by this court.

Further, the Chief Justice's conclusion that death cases tried prior to our adoption of the new rules are *per se* unreliable presupposes that the new rules were intended to set a constitutional standard rather than a procedure to enhance the quality of justice in future capital cases. The new rules were established to maximize fairness to the defendant, compliance with ethical responsibilities and the proper administration of justice. 188 Ill. 2d R. 701, Committee Comments, at cvi. To accept the Chief Justice's conclusion, we would have to assume that in all previous cases the performance of the trial attorneys was constitutionally inadequate regardless of what the record might reveal. This assumption would be inappropriate. Prior to the adoption of these rules, it was recognized that capital cases were frequently tried by competent and professional attorneys. Findings and Recommendations of the Special Supreme Court

Committee on Capital Cases 7, 9, 14, 20, 23 (October 28, 1999).

In adopting the new rules we never intimated that all cases tried prior to the new rules were lacking in reliability. The new rules emerged because we became cognizant of the fact that the outcome of some, *not all*, cases was flawed. We assigned lack of experience and training as the cause of those flaws. Fair and accurate results in a capital trial are the result of quality advocacy by both the prosecution and the defense. 188 Ill. 2d R. 714, Committee Comments, at cxiii. Thus, the new rules were designed to *minimize* the possibility of inaccuracy or unfairness occurring in capital cases.

Nevertheless, the committee recognized that capital cases tried without the benefit of the new rules were frequently tried by competent defense and prosecuting attorneys. Specifically, in formulating the new rules, the committee members agreed that assistant State's Attorneys in Illinois perform in a fair and professional manner in the "overwhelming majority" of capital cases. Findings and Recommendations of the Special Supreme Court Committee on Capital Cases 7 (October 28, 1999). The committee members further noted that, on the whole, prosecutors try capital cases "fairly and competently." Findings and Recommendations of the Special Supreme Court Committee on Capital Cases 9 (October 28, 1999).

In addition, the committee members found that the "vast majority of private attorneys meet their obligation to provide competent assistance of counsel." Findings and Recommendations of the Special Supreme Court Committee on Capital Cases 14 (October 28, 1999). Also, the consensus of the committee was that the quality of representation provided by public defenders in capital cases is "generally very good." In fact, committee members agreed that capital case representation provided

by the larger public defender offices is "excellent," with Cook County and some other jurisdictions having persons or units specifically assigned to capital defense. Findings and Recommendations of the Special Supreme Court Committee on Capital Cases 20 (October 28, 1999). Applying the Capital Litigation Trial Bar requirements to prosecutors and defense attorneys will help to assure that these standards are met in all capital cases.

This court has always carefully evaluated capital cases on a case-by-case basis with an overriding goal towards adherence to the law, fairness and accuracy. Our responsibility to review cases in this manner is unchanged by the new rules. It was never the intent of this court that the new rules be applied retroactively. Following the committee's recommendations and findings, this court announced that most of the new rules governing capital trials would take immediate effect on March 1, 2001. See 188 Ill. 2d Rs. 3.8, 43, 714. These rules were to go into effect "except when *** the application of the new rules in a particular case pending at the time *** would not be feasible or would work an injustice." 188 Ill. 2d R. 416; see also 188 Ill. 2d Rs. 411, 412, 417. The only rules that did not immediately take effect were those that required all attorneys in death penalty cases to be certified as a members of the Capital Litigation Trial Bar and those that required judges to have attended a Capital Litigation Seminar. We set an effective date of March 1, 2002, for those rules. 188 Ill. 2d Rs. 43, 701. We note that all of the new rules, and their respective effective dates, were created in an effort to *improve* the quality of advocacy in capital cases (188 Ill. 2d R. 714, Committee Comments, at cxiii), not as a basis to vacate all cases decided prior to their effective date.

The dissents further argue that, pursuant to the rules, defendant should not have been allowed to represent himself. The Chief Justice writes: "[Defendant] did

not have two competent lawyers to represent him. He did not have even one competent attorney to represent him." 204 Ill. 2d at 580 (Harrison, C.J., dissenting). The Chief Justice concludes that this court "must reject the fiction that this defendant was competent to represent himself." 204 Ill. 2d at 580 (Harrison, C.J., dissenting). Under the new rules, according to the Chief Justice, a capital defendant "never will be" competent to represent himself. 204 Ill. 2d at 580 (Harrison C.J., dissenting). This assertion raises the important issue of whether the new rules create a standard that overrules a defendant's constitutional right to self-representation. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). 204 Ill. 2d at 584 (Kilbride, J., dissenting).

In *Faretta*, the Supreme Court held that the sixth amendment right to counsel (U.S. Const., amend. VI) implicitly provides for the right to self-representation in criminal proceedings and that a criminal defendant has a constitutional right to refuse state-provided counsel and proceed without representation if he voluntarily and intelligently elects to do so. *Faretta*, 422 U.S. at 820-21, 45 L. Ed. 2d at 573-74, 95 S. Ct. at 2533-34.

The Court further explained:

"The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant— not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment." *Faretta*, 422 U.S. at 820, 45 L. Ed. 2d at 573, 95 S. Ct. at 2533.

The Illinois Constitution has a similar provision that guarantees an accused the right to self-representation in criminal proceedings. Ill. Const. 1970, art. I, § 8. In *People v. Coleman*, 168 Ill. 2d 509 (1995), this court decided whether the demands of increased reliability in capital trials required that the accused be represented by counsel

notwithstanding his own desire to proceed *pro se*. Citing to *Faretta* with approval, we expressly rejected the defendant's argument and held that the heightened need for reliability in capital cases does not justify forcing the accused to accept representation by counsel. *Coleman*, 168 Ill. 2d at 545.

The dissents would have us depart from this established precedent in light of the new rules. We decline to do so. The new rules are not intended to overrule well-established constitutional guarantees. Instead, the new rules are intended to provide a mechanism to achieve fair and accurate results in capital trials. They are rules of procedure. They do not set a new constitutional standard.

Despite the degree to which a trial judge may question the wisdom of a defendant who exercises his constitutional right to represent himself during a capital trial, the new rules do not eradicate that right once a defendant makes a voluntary and intelligent decision to proceed without assistance of counsel. In this case, defendant chose to represent himself at all stages of the trial proceedings. He made that decision voluntarily and intelligently. We cannot ignore a defendant's established constitutional right to represent himself. Therefore, we decline to hold that this right is overruled by the creation of the new rules.

We share the dissents' concern that innocent people may be placed on death row when fairness and accuracy yields to poor training and lack of experience. The new rules were established to improve the overall reliability of capital trials and lessen the possibility of the occurrence of errors. The most important safeguard of the fairness and accuracy of capital trials is the competence, professionalism, and integrity of the attorneys who try those cases. 188 Ill. 2d R. 714, Committee Comments, at cxiii. We emphasize, however, that the new rules create

neither a constitutional standard that overrules established constitutional rights nor invalidate prior decisions upholding those rights.

In affirming defendant's conviction, we have found that defendant did not suffer a deprivation of federal or state constitutional rights despite the fact that he represented himself during all phases of the trial. Other than noting that defendant exerted his constitutional right to represent himself, the dissents do not point to any deprivation of either federal or state constitutional rights in defendant's trial, conviction or sentence that would mandate post-conviction relief. Thus, defendant is not entitled to post-conviction relief.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County dismissing defendant's post-conviction petition without an evidentiary hearing is affirmed. Additionally, we affirm the dismissal of defendant's *pro se* petition for post-judgment relief (735 ILCS 5/2—1401 (West 1998)), as it raises the same issues as defendant's post-conviction petition.

We hereby direct the clerk of this court to enter an order setting Wednesday, January 16, 2002, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in a manner provided by law (725 ILCS 5/119—5 (West 2000)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE FREEMAN, specially concurring:

I agree with the court in all respects and join fully in the opinion affirming the orders of the circuit court. I

write separately only to express my views on a portion of Chief Justice Harrison's dissent to which the court today does not respond.

I note that the Chief Justice takes the same position here that he did in *People v. Hickey*, 204 Ill. 2d 585 (2001), *i.e.*, that the new supreme court rules addressing capital litigation serve to provide relief to a defendant even if no other basis exists to reverse the case. Having set forth the legal reasoning for his position, the Chief Justice states:

> "If our experience with capital cases over the past few years has taught us anything, it is that we must view everything that occurs at capital trials with heightened skepticism. When we surrender that skepticism, disaster follows. Just ask Ronald Jones, Joseph Burrows or Anthony Porter. We found ways to uphold each of their convictions and sentences when their cases first came before us, only to discover later that they were actually innocent." 204 Ill. 2d at 580 (Harrison, C.J., dissenting).

In my view, these remarks need to be addressed because they unfortunately call into question the integrity of the court.

The names listed in the dissent are some, but not all, of the men released from death row in Illinois when new evidence later was uncovered which cast doubt on the guilty verdicts rendered in each of their capital trials. I specifically take issue with the Chief Justice's comment that "we found ways" to uphold the convictions in these cases. When a fellow justice states that his court, as a body, has "found ways" to uphold convictions, that justice is saying his colleagues in these cases intentionally overlooked, got around, put to one side, ignored, or otherwise dismissed out of hand, something important that should have caused a reversal, whether that something was a legal argument or exculpatory evidence. The Chief Justice's remark, even if nothing more than rhetorical flourish, reaches well beyond mere disagreement with the legal reasoning of the other members of

the court. Rather, it constitutes a serious charge of unprofessional and unethical judicial conduct. Because the Chief Justice's statement is untrue and impugns the integrity of the court, I wish to comment on the facts underlying the cases of the men noted in the dissent.

Although this court affirmed Ronald Jones' convictions and sentence on direct review, what occurred in this court after that initial appeal deserves mention. After the completion of the direct review proceedings, a vaginal swab containing DNA evidence was discovered. This evidence was not presented at defendant's initial trial and was therefore not a part of the record on direct review. During the ensuing post-conviction proceedings, Jones' attorneys unsuccessfully argued in the circuit court of Cook County that the vaginal swab containing the newly discovered DNA evidence should be tested. Jones' lawyers, however, won a victory in this court when we directed the circuit court to release the evidence to Jones' attorney for the purpose of conducting DNA testing. After the testing was completed, it was revealed that Jones could not have been the perpetrator. This court then issued the following order:

"The order of the Circuit Court of Cook County denying the petition for post-conviction relief is vacated. This cause is remanded to the circuit court with directions to allow defendant's petition for post-conviction relief, vacate defendant's conviction and grant defendant a new trial."

At the subsequent proceedings on remand, the State dismissed the charges against Jones in light of the DNA evidence. In view of these facts, it seems incredible to me that any member of this court could state that this court "found ways" to uphold the convictions in this case.

With respect to Joseph Burrows, this court affirmed his convictions and death sentence on direct review in 1992. *People v. Burrows*, 148 Ill. 2d 196 (1992). After the completion of the direct review proceedings, Burrows filed a petition for post-conviction relief in which he al-

leged that, subsequent to his trial, evidence had come to light that the State's two principal witnesses against him had committed perjury, and that one of those witnesses had later admitted to being the killer. The circuit court granted defendant's post-conviction petition by vacating the convictions and ordering a new trial. The State appealed directly to this court, asking that we reverse the order of the circuit court and reinstate the convictions and death sentence. We rejected the State's argument and upheld the trial court's grant of a new trial. See *People v. Burrows*, 172 Ill. 2d 169 (1996) (*Burrows II*). I note that the trial court's decision to vacate the prior convictions was based largely on this court's opinion in *People v. Washington*, 171 Ill. 2d 475 (1996), in which we recognized that a claim of newly discovered evidence of actual innocence presents a constitutional question cognizable under the Post-Conviction Hearing Act. As in the Jones case, the evidence that exonerated Burrows was not available during the original trial. Nevertheless, this court did not hesitate to affirm the circuit court's order vacating the convictions when that evidence was brought to light.

Finally, with respect to the case of Anthony Porter, I acknowledge that this court upheld Porter's convictions and death sentence both on direct and collateral review. Indeed, the Chief Justice joined fully in the court's opinion affirming the denial of post-conviction relief. See *People v. Porter*, 164 Ill. 2d 400 (1995). This court did, however, later order Porter's execution stayed in order to review claims that Porter was mentally retarded and that, as a result, he lacked the mental capacity to be executed. During the period of the stay, new evidence came to light which was later used to exonerate him. Nothing in the opinions of the court or in the court's handling of the case supports the assertion raised by the Chief Justice that this court, he included, somehow "found ways" to uphold the Porter convictions.

The Chief Justice's deeply held position against the death penalty does not give him the license to ignore the facts. The death penalty is a highly charged, emotional area of the law that is very much in the public consciousness. Honorable people can and do disagree over whether the state should have a death penalty. However, by misrepresenting the past actions of this court, the Chief Justice does little more than fan the flames of sensationalism and denigrate this court in the eyes of the public.

JUSTICE McMORROW joins in this special concurrence.

CHIEF JUSTICE HARRISON, dissenting:
During the pendency of Simpson's appeal, our court adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking the death penalty. One of the most significant features of the new rules is their inclusion of rigorous standards governing the qualifications of individuals eligible to try capital cases.

Recognizing the indispensable role of competent trial counsel where the State is seeking the death penalty, our court has determined that such cases may only be handled by those attorneys who possess extensive experience and specialized training in the field. With limited exceptions, only attorneys who have become members of the Capital Litigation Trial Bar may appear as lead or co-counsel in capital cases. That restriction applies to both counsel for the State and counsel for the defense. 188 Ill. 2d Rs. 416(d), 701(b).

The eligibility standards for membership in the Capital Litigation Trial Bar are substantial. Lead counsel, for example, must have at leave five years of criminal litigation experience; have prior experience as lead or co-counsel in no fewer than eight felony jury trials which were tried to completion, at least two of which

were murder prosecutions; and have complete certain specified training requirements. The qualifications for co-counsel are comparable. 188 Ill. 2d R. 714(b). Attorneys who fail to meet the specified requirements may not appear in capital cases without receiving a waiver directly from our court (188 Ill. 2d R. 714(d)), and indigent defendants are entitled to representation by not one but two attorneys with the requisite qualifications (188 Ill. 2d R. 416(d).

Now that our court has adopted these stringent new rules, I fail to see how it can continue to sanction proceedings such as the one before us today. This defendant certainly did not have two competent lawyers to represent him. He did not have even one competent attorney to represent him. The trial court permitted him to proceeded *pro se*, despite serious questions as to the soundness of his judgment and his ability to reason.

Promulgation of the new rules is equivalent to a determination by this court that even a lawyer is not competent to handle a death case unless he has special training and experience. To be consistent with that determination, the court must reject the fiction that this defendant was competent to represent himself. He was not. Under the standards we have now imposed, he never will be. No legitimate purpose will be served by pretending otherwise. If our experience with capital cases over the past few years has taught us anything, it is that we must view everything that occurs at capital trials with heightened skepticism. When we surrender that skepticism, disaster follows. Just ask Ronald Jones, Joseph Burrows or Anthony Porter. We found ways to uphold each of their convictions and sentences when their cases first came before us, only to discover later that they were actually innocent.

The procedures contained in the new rules we have adopted may not be perfect. They may not eliminate all

of the constitutional defects in the present death penalty law. Without those rules, however, no capital conviction or sentence can be deemed reliable. *People v. Hickey*, 204 Ill. 2d 585, 634 (2001) (Harrison, C.J., dissenting). Because Simpson was tried, convicted and sentenced without the benefit of the new rules, his conviction and sentence should therefore be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Simpson were not entitled to avail himself of the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Simpson's sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. 720 ILCS 5/9—1(j) (West 1992).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissent in *People v. Hickey*, 204 Ill. 2d 585, 636 (2001), I agree with Chief Justice Harrison's conclusion that the new supreme court rules governing capital cases should be applied retroactively. At a minimum, I again state that the issue of retroactivity should have been more fully addressed by this court following the submission of supplemental briefs.

The majority concludes in this case that *Faretta* conclusively settles the issue of self-representation in all criminal cases, including capital cases. 204 Ill. 2d at 574. I disagree and contend that *Faretta* remains an open question with respect to capital cases. Not only was

*Faretta* decided at a time when the United States Supreme Court considered the death penalty unconstitutional, but the Court has recognized that the right to self-representation is not absolute. See *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 161, 145 L. Ed. 2d 597, 607, 120 S. Ct. 684, 691 (2000); see also *United States v. Farhad*, 190 F.3d 1097, 1101-09 (9th Cir. 1999) (Reinhardt, J., specially concurring) (criticizing *Faretta*).

In *Martinez*, the Court characterized the *Faretta* rationale as a balance between the right of self-representation and competing governmental interests. *Martinez*, 528 U.S. at 162, 145 L. Ed. 2d at 607, 120 S. Ct. at 691. In considering those interests, *Martinez* stated that "[e]ven *at the trial level*, *** the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." (Emphasis added.) *Martinez*, 528 U.S. at 162, 145 L. Ed. 2d at 607, 120 S. Ct. at 691.

Equally important, *Faretta* does not trump the mandatory minimum requirements of our capital rules because the "status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict." *Martinez*, 528 U.S. at 162, 145 L. Ed. 2d at 607, 120 S. Ct. at 691. In a capital case, the death penalty phase is sought only after the return of a guilty verdict. Thus, *Martinez* recognizes that the *Faretta* right of self-representation may well yield to other governmental interests after a guilty verdict, including the same interests espoused by our rules to ensure reliability and fundamental fairness in capital cases. 188 Ill. 2d Rs. 3.8, 43, 411, 412, 416, 417, 701, 714. Accordingly, in view of *Martinez*, we should examine carefully the right to self-representation during the aggravation-mitigation phase. See also E. Rieder, Note, *The Right of Self-Representation in the Capital Case*, 85 Colum. L. Rev. 130, 152-54 (1985).

In his concurring opinion in *Martinez*, Justice Breyer cites a Ninth Circuit judge's observation that the right of self-representation frequently conflicts squarely with the constitutional right to a fair trial. *Martinez*, 528 U.S. at 164, 145 L. Ed. 2d at 608-09, 120 S. Ct. at 692 (Breyer, J., concurring), citing *Farhad*, 190 F.3d at 1101-09 (Reinhardt, J., specially concurring). Specifically, Justice Breyer notes Judge Reinhardt's observation that "the Court has never directly addressed the argument of the *Faretta* dissenters [Justice Blackmun, joined by Chief Justice Burger and Justice Rehnquist] that the Sixth Amendment right to self-representation would lead to unfair trials and unjust convictions." *Farhad*, 190 F.3d at 1101 (Breyer, J., concurring).

In *Wheat v. United States*, 486 U.S. 153, 160, 100 L. Ed. 2d 140, 149, 108 S. Ct. 1692, 1697-98 (1988), the Supreme Court clarified that, under certain circumstances, individual sixth amendment rights must yield to society's interests in assuring fair trials. The Supreme Court rejected a defendant's attempt to waive a sixth amendment right because "the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized." *Wheat*, 486 U.S. at 160, 100 L. Ed. 2d at 149, 108 S. Ct. at 1698.

Hence, *Wheat* raises the open question of the extent of the conditional nature of the right of self-representation. For example, this court has an overriding obligation to protect a defendant's rights. That obligation almost certainly goes unfulfilled when, as is often the case, a *pro se* defendant presents a lacking and inept defense. See, *e.g., Powell v. Alabama*, 287 U.S. 45, 69, 77 L. Ed. 158, 170-01, 53 S. Ct. 55, 64 (1932) (discussing the typical quality of self-representation). Fundamental fairness prevents a court from imposing the ultimate sentence of death when the court lacks the ability to discern exculpatory or mitigating facts due to inadequate

self-representation. Without expressing an opinion on the propriety of the death penalty, I believe that, at a bare minimum, justice requires that we ensure that capital punishment is imposed only under appropriate circumstances.

This case represents the exact kind of capital defendant whom we should not allow to represent himself. Defendant suffered from frequent and severe headaches, dizziness, and fainting spells. After his conviction, it came to light that defendant has a lodged bullet in his head. It was similarly learned that defendant suffered long-term psychological conditions and deficits.

We need not conclude that defendant's state of mind allowed for a knowing, voluntary, and intelligent waiver of his constitutional right to the effective assistance of counsel. Defendant's failure to present existing mitigating evidence during the sentencing phase amply demonstrates the potential destructiveness of self-representation. Despite strong admonitions from the trial court, defendant capriciously effected his own inevitable death sentence.

*Faretta* allowed the waiver of counsel conditioned upon a trial court's determination that a defendant's waiver is made with " 'eyes open.' " *Faretta v. California*, 422 U.S. 806, 835, 45 L. Ed. 2d 562, 582, 95 S. Ct. 2545, 2541 (1975), quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 87 L. Ed. 268, 274, 63 S. Ct. 236, 242 (1942). Toward that end, we must not allow capital defendants to undertake self-representation in conflict with this court's constitutional duties to assure a fair trial for every defendant. See *Farhad*, 190 F.3d at 1102 (Reinhardt, J., specially concurring). In short, I again urge that our new mandatory rules eliminate the right of self-representation in a capital case.

For these reasons, I respectfully dissent. I express no opinion regarding the propriety of the death penalty, nor

do I express any opinion in relation to the other issues raised by Chief Justice Harrison's dissent in *People v. Bull*, 185 Ill. 2d 179 (1998).