2022 IL App (2d) 190846
No. 2-19-0846
Opinion filed January 12, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1064 |
| | ) ) | Honorable |
| ANDREW S. HUI, | ) ) | Liam Brennan and George J. Bakalis, |
| Defendant-Appellant. | ) | Judges, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial at which he represented himself, defendant, Andrew S. Hui, was convicted of 12 counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2010)) and 1 count of aggravated criminal sexual abuse (*id.* § 11-1.60(b)). He was sentenced to consecutive six-year prison terms on each of the predatory criminal sexual assault convictions and a consecutive three-year term on the aggravated criminal sexual abuse conviction. Defendant now appeals from his convictions. We affirm.

¶ 2                                      I. BACKGROUND

¶ 3      The charges against defendant arose from a series of acts occurring between defendant and his niece, A.H., between April 2011 and June 2013. An original report of the allegations was made to the Oak Brook Police Department, which then contacted investigators from the Du Page County Children's Center (DCCC). George Fencl, a criminal investigator for the Du Page County State's Attorney's Office (DCSAO), took over the investigation, which included conducting a forensic interview of A.H., executing an eavesdrop and a search warrant, and interviewing defendant. Fencl ultimately placed defendant under arrest.

¶ 4      Defendant was originally charged with four counts of predatory criminal sexual assault and five counts of aggravated criminal sexual abuse. Defendant was represented by private counsel from his arraignment in June 2015 until June 9, 2017, when he informed the trial court that he wished to proceed *pro se*. The court ultimately discharged private counsel. Defendant proceeded to file and vigorously brief and argue multiple pretrial motions, including a motion to suppress evidence based, in part, on defendant's allegations that Fencl was improperly appointed as an investigator and therefore lacked the authority to investigate and arrest him. All of defendant's motions were denied by the trial court.

¶ 5      In August 2018, the State indicted defendant on an additional nine counts of predatory criminal sexual assault against A.H. Defendant was arraigned on these new counts on August 30. During this arraignment, defendant was admonished as to the sentencing possibilities of the new, as well as the old, charges.

¶ 6      In January 2019, the trial court entered an order requiring a public defender investigator to meet with defendant to facilitate service of subpoenas on civilian witnesses. On May 8, as the June 11 trial date approached, defendant requested that the trial court appoint the public defender "for purposes of trial and anything else I may need." The trial court found that the request was not for

dilatory purposes and appointed the public defender to represent defendant. The following day, counsel requested time to review discovery and, if necessary, request a continuance of the trial date. The following colloquy then took place:

> "[DEFENSE COUNSEL]: Your Honor, I spoke with Mr. Hui about the underlying basis of why he was asking for the appointment of counsel, and he and I had a productive conversation of what his expectations and goals were as well as the role of appointed counsel.
>
> Based on that, Judge, he is not asking that the PD's office be discharged at this point, but he did want me to inquire about whether the Court, rather than make a full appointment, would address the issue about standby counsel rather than full appointment.
>
> THE COURT: I have already made the investigators from the Public Defender's office available to the defendant to assist him with any types of things necessary to accomplish service, even to accomplish investigations.
>
> I don't know what it is standby counsel would do really beyond that in this context. Right now the Public Defender is appointed in its full capacity, and that's the capacity that I anticipate moving forward with at this juncture."

The court continued the case until May 14, 2019.

¶ 7    On that date, counsel informed the court that he would not be prepared to proceed with trial on June 11 and requested a continuance. Discussing a July date, counsel informed the court that he "wouldn't rule it out" that he would be prepared for trial that week. Trial was then set by agreement for July 16.

¶ 8    On June 17, 2019, counsel moved for a continuance of trial until September or October, citing the voluminous discovery. The trial court asked counsel if, were the court to deny the

motion, he would be ready for trial on July 16; counsel conceded that he could be ready. The court then denied the motion.

¶ 9      On July 11, counsel informed the court, with Judge George Bakalis sitting in Judge Liam Brennan's stead, that defendant was moving to discharge the public defender. In his motion, defendant stated that, after having multiple conversations with counsel regarding trial strategy, defendant "would prefer to direct the legal strategy in this matter, knowing that it would require discharge of appointed counsel." Defendant also moved for reconsideration of the denial of counsel's June 17 motion for a continuance, seeking an approximately four-week continuance and the assignment of the public defender "in an advisory role." After questioning defendant about the realities and consequences of representing himself, Judge Bakalis granted defendant's motion to discharge counsel and reappointed the public defender's investigator to assist with service of process; however, the court set the matter for July 15 before Judge Brennan for reconsideration of the denial of the motion for a continuance and the request for the appointment of the public defender in an advisory role.

¶ 10      The case appeared again on July 12 before Judge Brennan. The court noted that, since defendant was again proceeding *pro se*, the motion was not one to reconsider the denial of the public defender's motion for a continuance but a new motion for a continuance by defendant. During extensive discussion between the court and defendant, the court asked why defendant thought that he could not be ready for trial on the scheduled date. Defendant explained that he needed "to play catch-up" for the two months that the public defender, rather than he, had been preparing for trial. Defendant was also concerned with being able to properly prepare a motion for a new trial or his notice of appeal in light of pretrial motions and rulings. The court denied defendant's motion for a continuance, finding:

"All right. So long story short, I believe the defendant is amply ready for trial. I've not heard anything that is a statutory basis for a continuance. The case has been set for trial several times previously. I granted the defendant's last request for a continuance.

I'm not inclined to grant a second request, especially in the context of him discharging his lawyer yesterday and having been told correctly by Judge Bakalis that it would be highly unlikely that the case would be continued in that context."

The court also denied defendant's motion to appoint the public defender as standby counsel.

¶ 11 On July 15, defendant filed a reply brief to the State's motion to quash defendant's criminal subpoena of State's Attorney Robert Berlin and a "Motion to Reconsider Motion for Continuance No. 2," incorporating issues and arguments that arose from the July 12 hearing on his prior motion to reconsider. The trial court quashed the subpoena and denied defendant's motion.

¶ 12 The matter then proceeded to jury trial, with defendant representing himself. Defendant was ultimately convicted of nine counts of predatory criminal sexual assault and one count of aggravated criminal sexual abuse and sentenced to the Department of Corrections. The trial court denied defendant's motion for a new trial and his motion to reconsider his sentence. This appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14 Defendant first contends that the trial court erred in denying his motion to suppress evidence. According to defendant, Fencl lacked the authority to act as a special investigator, because he failed to comply with fingerprinting and background verification procedures contained in section 3-9005(b) of the Counties Code (Code) (55 ILCS 5/3-9005(b) (West 2016)). Alternatively, if Fencl did have proper authority to act as an investigator, he exceeded that

authority as defined in section 7.06(a) of the State's Attorneys Appellate Prosecutor's Act (Act) (725 ILCS 210/7.06(a) (West 2016)).

¶ 15    On review of a ruling on a motion to quash an arrest and suppress the evidence seized, our standard of review is usually twofold: (1) we accord great deference to the trial court's factual findings and credibility determinations, reversing those conclusions only if they are against the manifest weight of the evidence, and, (2) after reviewing the trial court's factual findings, we review *de novo* the trial court's ultimate legal ruling. *People v. Galarza*, 391 Ill. App. 3d 805, 812 (2009). As the facts are not in dispute here and the trial court did not make any credibility assessments, our review is *de novo*.

¶ 16    Section 3-9005(b) of the Code provides in relevant part:

"The State's Attorney of each county shall have authority to appoint one or more special investigators to serve subpoenas and summonses, make return of process, and conduct investigations which assist the State's Attorney in the performance of his duties. *** A special investigator shall not carry firearms except with permission of the State's Attorney and only while carrying appropriate identification indicating his employment and in the performance of his assigned duties.

Subject to the qualifications set forth in this subsection, special investigators shall be peace officers and shall have all the powers possessed by investigators under the State's Attorneys Appellate Prosecutor's Act.

No special investigator employed by the State's Attorney shall have peace officer status or exercise police powers unless he or she successfully completes the basic police training course mandated and approved by the Illinois Law Enforcement Training Standards Board or such board waives the training requirement by reason of the special

investigator's prior law enforcement experience or training or both. Any State's Attorney appointing a special investigator shall consult with all affected local police agencies, to the extent consistent with the public interest, if the special investigator is assigned to areas within that agency's jurisdiction.

Before a person is appointed as a special investigator, his fingerprints shall be taken and transmitted to the Department of State Police. The Department shall examine its records and submit to the State's Attorney of the county in which the investigator seeks appointment any conviction information concerning the person on file with the Department. No person shall be appointed as a special investigator if he has been convicted of a felony or other offense involving moral turpitude." 55 ILCS 5/3-9005(b) (West 2016).

¶ 17    Defendant first argues that Fencl lacked authority as an investigator because his fingerprints were not properly submitted to the Department of State Police (State Police) for examination.

¶ 18    At the hearing on defendant's motion to suppress, Fencl testified that he had never been arrested for, charged with, or convicted of any criminal offense. He was appointed as a criminal investigator for the DCSAO in 2008. At that time, he signed and submitted a criminal background check authorization form, but he could not recall if he submitted fingerprints. In 2010, he worked on a contractual basis with the Department of Children and Family Services (DCFS) as well as in his capacity as an investigator. In March 2010, his fingerprints were taken and submitted to the State Police. The investigation revealed no criminal background. He was re-sworn as a special investigator for the DCSAO in 2015, and his fingerprints were taken on June 11, 2015.

¶ 19    Kevin Hennessy, chief of administration for the DCSAO, testified that he prepared paperwork for Fencl's 2008 appointment. While a check for criminal background was performed

via the Law Enforcement Agencies Data System (LEADS) database, "the state database that law enforcement agencies use to review criminal background," Fencl's fingerprints were not submitted to the State Police for a criminal background check. LEADS revealed no criminal background.

¶ 20 Fencl's personnel file contained an authorization for fingerprinting by DCFS from March 2010. This form noted that Fencl was already working for the DCCC and was to work for the DCFS on a contractual basis. Fencl's fingerprints were submitted to the State Police, which found "no criminal background." Regarding the 2015 submission of Fencl's fingerprints to the State Police, Hennessy testified that the state's attorney directed that all investigators be fingerprinted again.

¶ 21 The trial court denied the motion. While finding that there was "absolutely no question" that section 3-9005(b) of the Code had not been followed, the court concluded that section 3-9005(b) was "directory and not mandatory" because the Code provided no consequence for noncompliance.

¶ 22 Defendant now argues that the trial court erred in finding that the background-verification procedures were directory, not mandatory, and that noncompliance with those requirements resulted in Fencl lacking police powers when he conducted the investigation and arrested defendant. However, we find that this argument of mandatory versus directory is, in this case, irrelevant. The evidence adduced at the hearing is clear that Fencl's fingerprints had been submitted to the State Police in 2010, resulting in a finding of "no criminal background," prior to his investigation and arrest of defendant. Even assuming, *arguendo*, that defendant is correct in asserting that an appointment as an investigator is not valid in the absence of the submission of the applicant's fingerprints to the State Police, Fencl's fingerprints *were* submitted to the State Police

in 2010, five years before he began his investigation of defendant. Thus, defendant's contention is not based on the evidence as it actually exists in this case.

¶ 23     We also note that it is not the failure to submit fingerprints, but the existence of criminal history, that can prohibit an appointment as an investigator. According to section 3-9005(b), the State Police is to examine its records based on a fingerprint submission and notify the state's attorney of "any conviction information concerning the person on file with the Department." *Id.* "No person shall be appointed as a special investigator *if he has been convicted of a felony or other offense involving moral turpitude*." (Emphasis added.) *Id.* The validity of an appointment is contingent on the lack of criminal history, not on the fact that the State Police verified the lack of criminal history through the use of fingerprints. Here, Hennessy, chief of administration for the DCSAO, testified that, at the time of Fencl's initial appointment, a criminal background check was performed via the LEADS database, "the state database that law enforcement agencies use to review criminal background," and it revealed no criminal history. In addition, State Police checks of Fencl's fingerprints in 2010 and 2015 revealed no disqualifying criminal history. Thus, there was no impediment to Fencl's appointment.

¶ 24     While Fencl was not precluded from acting as a state's attorney investigator by any criminal history, we find that the state's attorney's failure to submit Fencl's fingerprints prior to Fencl's appointment was, indeed, error. In this situation, that error resulted in no prejudice to defendant, as no disqualifying criminal history existed. However, had a later fingerprint submission revealed such history that, for whatever reason, was not disclosed via the LEADS examination, this case, and any other convictions to which Fencl's investigations contributed, would potentially have been thrown into question.

¶ 25    We presume that a public official performs the functions of his office according to the law and that he does his duty. See *Lyons v. Ryan*, 201 Ill. 2d 529, 539 (2002). " 'It is presumed that [the state's attorney] will act under such a heavy sense of public duty and obligation for enforcement of all our laws that he will commit no wrongful act.' " *Suburban Cook County Regional Office of Education v. Cook County Board*, 282 Ill. App. 3d 560, 571 (1996) (quoting *People ex rel. Kunstman v. Nagano*, 389 Ill. 231, 252 (1945)). We do not have to determine whether the failure to send in Fencl's fingerprints at the time of his appointment was a clerical error or a calculated violation of the Code. However, as the state's attorney's duties involve the investigation and prosecution of crime, we must say that the state's attorney must be held to the highest standards when it comes to following the law.

¶ 26    While the state's attorney did violate the Code in this case, defendant was not prejudiced by the state's attorney's error. Because the error was not prejudicial, it does not constitute a basis for reversal.

¶ 27    Defendant next argues that, even if Fencl was properly appointed as an investigator, he exceeded the scope of his authority when he failed to cooperate with local law enforcement in exercising his police powers. Special investigators are peace officers "and shall have all the powers possessed by investigators under the State's Attorneys Appellate Prosecutor's Act." 55 ILCS 5/3-9005(b) (West 2016). Section 7.06(a) of the Act provides in relevant part:

> "Subject to the qualifications set forth below, investigators shall be peace officers and shall have all the powers possessed by policemen in cities and by sheriffs; provided, that investigators shall exercise such powers anywhere in the State only after contact and in cooperation with the appropriate local law enforcement agencies, unless the contact and

cooperation would compromise an investigation in which they have a personal involvement." 725 ILCS 210/7.06(a) (West 2016). In his motion to suppress evidence, defendant alleged that Fencl had "exclusive responsibility" for the investigation and that the DCSAO "exclusively handled the investigation and arrest" of defendant. Thus, defendant argues, Fencl failed to cooperate with the Oak Brook Police Department and the Warrenville Police Department in exercising his police powers, thereby exceeding his authority.[1]

¶ 28 At the hearing on the motion to suppress, Detective Dorothy Weihofen of the Warrenville Police Department testified that she was present when defendant was taken into custody in a McDonald's parking lot and that she was "assisting the Children's Center if needed in making contact with" defendant and to assist in his arrest, if needed. She was not involved in defendant's arrest or interrogation. She was not involved in the application for and execution of the eavesdrop or the search warrant or any forensic interviews.

¶ 29 Detective Katherine Yager of the Oak Brook Police Department testified that she took the initial report in this case from A.H.'s father on March 10, 2015. She then forwarded the report to the DCCC. While she never met with Fencl, she spoke with him on the telephone regarding the investigation. She also completed two follow-up reports in April 2015 that she faxed to Fencl at his request. Other than the DCCC, she did not work in cooperation with any other professional

---

[1] While defendant initially raised this issue in his motion to suppress evidence, he also raised it in a later-filed motion to suppress the contents of the eavesdrop recording and evidence derived therefrom.

agencies during the investigation. Yager was not present at Fencl's forensic interview of A.H., the application for and execution of the eavesdrop or the search warrant, or defendant's arrest.

¶ 30    Fencl testified that he was not part of a "multi-disciplinary team" during the investigation. He did "work in cooperation" with Yager. Yager contacted the DCCC to investigate the case, and Fencl was assigned to the investigation. When asked if he cooperated with the Oak Brook Police Department regarding the forensic interview of A.H., Fencl responded that he had; he notified Yager that the forensic interview was to be performed and sent her a copy of the interview on a disc. He had no contact with the Oak Brook Police Department regarding the eavesdrop or the search warrant.

¶ 31    The Warrenville Police Department was aware of Fencl's investigation but was not aware that Fencl was going to arrest defendant. No Warrenville police were present when Fencl interrogated defendant or when defendant was transported to jail. Fencl did contact the Warrenville Police Department when he had defendant's car towed.

¶ 32    Nowhere does section 7.06(a) of the Act define the level of required cooperation with the appropriate local law enforcement agencies. In his argument, defendant tries to emphasize a lack of cooperation as to each specific phase of the investigation, *e.g.*, the forensic interview and the application for and implementation of the eavesdrop and the search warrant.

¶ 33    Our supreme court has noted that a state's attorney's duty to investigate suspected illegal activity "acknowledges that a prosecutor ordinarily relies on police and other agencies for investigation of criminal acts." *People v. Ringland*, 2017 IL 119484, ¶ 24. That duty "is premised on a deference to law enforcement agencies." *Id.* The supreme court then concluded that "the State's Attorney's common-law duty to investigate suspected illegal activity is limited to circumstances where other law enforcement agencies inadequately deal with such investigation

[citation] *or where a law enforcement agency asks the State's Attorney for assistance* (see [*People v.] Wilson*, 254 Ill. App. 3d [1020,] 1039 [(1993)]).￼" (Emphasis added.) *Id.* ¶ 25.

¶ 34    In this case, the Oak Brook Police Department clearly asked the DCCC for assistance. Yager testified that, after taking the initial report, she forwarded it to the DCCC. Fencl testified that Yager contacted the DCCC to investigate the case, and he was then assigned to the investigation. He also testified that he did "work in cooperation" with the Oak Brook Police Department. While citing *Ringland*, defendant never addresses the supreme court's conclusion in that case. He tries only to find equivalency between Fencl's investigation here and the factual situation in *Ringland*, where state's attorney's investigators were formed into a drug interdiction team to patrol the highways, " 'look for narcotics traffickers and criminals,' " make traffic stops, and " 'arrest people who were smuggling narcotics or proceeds from narcotics up and down the interstates in Illinois in La Salle County.' " See *id.* ¶ 6. Fencl's investigation here was in no way comparable to the investigators' actions in *Ringland* and fits within the supreme court's approved circumstance of "where a law enforcement agency asks the State's Attorney for assistance." We find no error in the trial court's denial of defendant's motion to suppress on this basis.

¶ 35    Having concluded that Fencl's flawed appointment as an investigator for the DCSAO did not prejudice defendant and that Fencl did not exceed his authority as an investigator, we find no error in the trial court's denial of defendant's motion.

¶ 36    Defendant next contends that his waiver of counsel just before trial was invalid, both because it was equivocal and because the trial court failed to admonish him in substantial compliance with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). We disagree on both arguments.

¶ 37    First, defendant acknowledges that he failed to raise this issue in his posttrial motion. Generally, the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, the plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error when:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' [Citation.]" *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

The first step of plain-error review is determining whether any error occurred; the burden of persuasion rests with the defendant. *Id.*

¶ 38    Defendant first argues that the trial court erred in allowing him to discharge counsel and proceed *pro se* on the eve of his jury trial, because defendant "did not want to waive counsel; instead, he discharged counsel then because he thought he had 'no choice.' "

¶ 39    A criminal defendant is entitled to the representation of counsel at all critical stages of a prosecution, and this important right will not be taken away unless it is affirmatively waived by a defendant. *People v. Burton*, 184 Ill. 2d 1, 22 (1998). Waiver of counsel must be clear and unequivocal, not ambiguous. *Id.* at 21. "A defendant waives his right to self-representation unless he 'articulately and unmistakably demands to proceed *pro se*.' [Citation.]" *Id.* at 22. A defendant must explicitly inform the trial court that he wishes to proceed *pro se*, because " '[a]nything else is an effort to sandbag the court and the opposition, to seek an acquittal with an ace up the sleeve

to be whipped out in the event of conviction.' " *Id.* (quoting *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992)). In determining whether a defendant's statement is, indeed, clear and unequivocal, a court must look at the overall context of the proceedings and determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. *Id.*

¶ 40    Even where a defendant gives some indication that he wants to proceed *pro se*, he may still later acquiesce in representation by counsel, such as by vacillating or abandoning an earlier request to proceed *pro se*. *Id.* at 23. A defendant's conduct following his request to represent himself is relevant to determining whether a defendant seeks to relinquish counsel. *Id.* at 23-24. Once such proceedings have begun, a trial judge has the discretion to deny a defendant's request to represent himself. *Id.* at 24. We review for an abuse of that discretion a trial court's determination regarding a defendant's waiver of counsel. *People v. Baez*, 241 Ill. 2d 44, 116 (2011).

¶ 41    The July 11, 2019, written motion to discharge the public defender, which was prepared by counsel, stated:

> "The Defendant and the Assistant Public Defender have had numerous conversations related to trial strategy. The Defendant has been apprised of and understands that decisions relating to trial strategy are within the purview of the attorney. The Defendant would prefer to direct the legal strategy in this matter, knowing that it would require discharge of appointed counsel."

¶ 42    When presented with this motion, Judge Bakalis, who was sitting in Judge Brennan's stead, asked defendant, "Sir, my understanding is you want to represent yourself again, is that correct?" Defendant responded, "That is correct." There is nothing equivocal or ambiguous in the answer. And it is shocking that nowhere in the arguments regarding this issue in defendant's briefs does defendant mention, let alone address, this straight-forward exchange.

¶ 43    Instead, defendant focuses on the averment contained in his *pro se* motion to reconsider the denial of the motion for a continuance, filed that same day, that he "has no choice but to re-proceed as PRO SE and is only asking for a few weeks continuance." According to defendant, this shows that he did not truly desire to represent himself and did not definitively invoke his right of self-representation. See *People v. Pike*, 2016 IL App (1st) 122626, ¶ 109.

¶ 44    However, the record shows that this motion to reconsider was not presented to, argued to, or considered by Judge Bakalis before he granted the motion to discharge the public defender. When defendant mentioned the motion to reconsider, the following took place:

> "THE COURT: I'm not going to do that. It's up to Judge Brennan.
>
> MR. HUI: Right. Exactly. This might be a matter for—"

When the motion to reconsider was again mentioned later, Judge Bakalis stated, "I'm not going to do that." Defense counsel then stated, "I understand that. [Defendant] just wants to file that and put it up for Monday [(before Judge Brennan)]." Thus, defendant now bases much of his argument on "evidence" that he did not present to the court and agreed should be considered by a different judge.

¶ 45    Defendant also points to another colloquy in support of this claim:

> "THE COURT: And once you make this decision the trial starts next week. You're not going to be able to say now I want a lawyer. That's it. You would be representing yourself. Do you understand that?
>
> MR. HUI: I do understand.
>
> THE COURT: What is it you're asking?
>
> MR. HUI: We are asking here, your Honor, is that we may need to let Judge Brennan decide this right now.

THE COURT: I'm sorry what?

MR. HUI: Brennan is familiar with the case, an ongoing situation, and I feel it's best for him to decide how to proceed with this.

[DEFENSE COUNSEL]: Which issue are you talking about the issue about whether—.

THE COURT: About representing yourself?

MR. HUI: Right, but deciding for him to be co-counsel in an advisory—and also the continuance for trial, too.

THE COURT: That's up to Judge Brennan.

MR. HUI: Exactly.

THE COURT: I agree with you. I'm not going to grant you continuance. But in terms of representing yourself, if that's what you want to do, I'll give you the right to represent yourself which you have a right to do.

* * *

THE COURT: Make it clear, sir. If you're representing yourself, I don't think Judge Brennan will give you a continuance. You can't say I'm not prepared to go to trial. You've had four years to go to trial. So if that's your argument, that's not going to fly.

MR. HUI: Well—

THE COURT: Okay. I'm just telling you. In my opinion, it won't fly. So if that's your argument, I would suggest you stay with your attorney. I don't think Judge Brennan is going to give you a continuance. But, again, that's your right to represent yourself and I'll allow you to represent yourself. The admonition I'm giving you is that I think it's

highly, highly likely [*sic*] that Judge Brennan is going to give you a continuance. So you should be set to go to trial next week. Okay. All right."

¶ 46    Both times that the trial court specifically asked defendant about representing himself ("Sir, my understanding is you want to represent yourself again, is that correct?" and "You would be representing yourself. Do you understand that?"), defendant answered affirmatively. There was no ambiguity in his answers. Defendant clearly stated his intent to waive counsel several times.

¶ 47    In the context of the four years of proceedings in this case, defendant was well aware of the meaning of representing himself; he had already dismissed private counsel and proceeded to represent himself for approximately two years, filing, briefing, and litigating pretrial motions. Defendant was well aware of what he was asking for.

¶ 48    In addition, defendant's subsequent conduct was consistent with waiver of counsel. When determining whether a defendant seeks to relinquish counsel, a court may look at the defendant's conduct following his request to represent himself. See *Burton*, 184 Ill. 2d at 23-24; *People v. Phillips*, 392 Ill. App. 3d 243, 261 (2009). Here, defendant had already written and filed his *pro se* motion to reconsider the denial of the motion for a continuance by July 11, the date on which Judge Bakalis granted the motion to discharge counsel. Three days after the trial court denied that motion to reconsider on July 12, defendant drafted another motion to reconsider, based on the July 12 hearing, and filed a reply brief and argued about a motion to quash a subpoena. On that same date, defendant informed the trial court that he wished to be attired in his jail-issued jumpsuit during the trial, informing the court of his reasoning and intent in doing so. Defendant engaged in discussions regarding the mechanics of the upcoming trial, including *voir dire*, opening statements, and jury instructions. Defendant busily drafted *pro se* pleadings, argued the issues in court, and

demonstrated knowledge and strategic thinking regarding his upcoming trial. All of this demonstrates defendant's plan to waive counsel and represent himself.

¶ 49     We find nothing in the record that demonstrates that defendant was equivocal in his desire to dismiss the public defender and represent himself at trial. Thus, we find no abuse of discretion on this basis. As we find no error on this ground, there is no basis for further plain-error analysis.

¶ 50     Defendant also argues that his waiver of counsel was invalid because the trial court failed to properly admonish him. A trial court's acceptance of a defendant's waiver of counsel is governed by Rule 401(a), which provides:

"(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 51     The purpose of Rule 401(a) is "to ensure that a waiver of counsel is knowingly and intelligently made." (Internal quotation marks omitted.) *People v. Reese*, 2017 IL 120011, ¶ 62. Strict, technical compliance with the rule is not always required; substantial compliance is sufficient for a valid waiver of counsel if the record shows that the waiver was made knowingly and intelligently and that the trial court's admonishment did not prejudice the defendant's rights.

*Id.* A defendant's level of sophistication is a factor to consider in determining substantial compliance. See *People v. Thomas*, 335 Ill. App. 3d 261, 264 (2002); *People v. Meeks*, 249 Ill. App. 3d 152, 172 (1993). Each waiver of counsel is *sui generis* and must be assessed on its own particular facts. *Reese*, 2017 IL 120011, ¶ 62. When deciding whether the defendant knowingly and intelligently waived his right to counsel, a court should consider the entire record. *Meeks*, 249 Ill. App. 3d at 172 (citing *People v. Barker*, 62 Ill. 2d 57, 59, (1975) (which applied such consideration to waiver of counsel in a probation revocation proceeding)).

¶ 52    We first note that defendant devotes exactly three sentences of his brief to the argument that the trial court's admonishments regarding subsections (a)(1) (nature of the charge) and (a)(2) (minimum and maximum sentence) "were not fully compliant" with Rule 401. This court is entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; any arguments inadequately presented are forfeited. See *Klein v. Caremark International, Inc.*, 329 Ill. App. 3d 892, 905 (2002). We will not consider defendant's argument.

¶ 53    Defendant then argues that the trial court failed to admonish him about his right to counsel pursuant to subsection (a)(3). See Ill. S. Ct. R. 401(a)(3) (eff. July 1, 1984). When Judge Bakalis was informed that defendant, on the eve of trial, wished to proceed *pro se*, he first established that defendant did, indeed, wish to represent himself again; defendant clearly stated, "That is correct." After establishing that defendant was 41 years old with a bachelor's degree in fine arts and no prior trial experience, the trial court explained that this case involved Class X felony sentencing, telling defendant that he was looking at "pretty much a life time sentence" if he was convicted. The trial court continued:

"THE COURT: *** You understand—hopefully you understand at this point it's not a simple matter to represent yourself. It's an involved process. Yo[u] have to know rules of evidence. You have to know—is this a jury trial?

MR. HUI: Yes, it is.

THE COURT: Have to know about picking a jury and how to deal with juries. If you haven't had that experience, it can be very difficult. At an actual trial, attorneys have that experience, knows how to do those things, knows how to object to evidence which you may not know about and allow into evidence things that shouldn't be going into evidence. Have to know how to do that. If you're found guilty, not going to be able to complain on appeal of ineffective assistance because it's you. You're representing yourself. Do you understand that?

MR. HUI: Yes, I do understand."

¶ 54    Looking at the entire record in this case, and not only the actual admonishment given, we conclude that defendant was well aware of his right to counsel in general, and his right to appointed counsel, such that the admonishment given to defendant substantially complied with the requirements of Rule 401. Defendant was initially represented by private counsel before he waived counsel in June 2017. Defendant notes in his brief that, among other things, the trial court at that time "went on to say that [defendant] was entitled to counsel and that there were many benefits to proceeding with counsel" such that "[t]he judge's admonitions complied with Rule 401(a)." In May 2019, approximately two months before the admonishments at issue here, defendant sought representation by the public defender, telling the trial court, "I just would say that you are correct that I am not a lawyer so I am actually requesting a Public Defender to be appointed to me." He requested the public defender "for purposes of trial and anything else I may need." That request

was granted. It is clear that defendant knew, at the time that he informed the trial court that he wished to discharge the public defender, that he had a right to counsel, even appointed counsel. He had been admonished regarding this right in the past and had just exercised his right to have counsel appointed for him. Even though Judge Bakalis did not specifically admonish defendant on the right to counsel, he did point out the potential consequences of proceeding without the counsel who had just been appointed for him. Defendant's argument is one of form over substance.

¶ 55    We conclude that the evidence shows that the trial court substantially complied with Rule 401 such that defendant made a knowing, voluntary waiver of his right to counsel. We find no error here and therefore need not proceed further with a plain-error analysis.

¶ 56    Defendant finally contends that the trial court erred in denying his motion for standby counsel. Under both the federal and state constitutions, a criminal defendant has a right to represent himself in a criminal proceeding. *People v. Harris*, 2020 IL App (3d) 160169, ¶ 38. As the right of self-representation does not carry with it the right to legal assistance, a defendant who chooses to represent himself must be prepared to do so. *Id.* (citing *People v. Simpson*, 204 Ill. 2d 536, 562 (2001)). However, a trial court may, in its discretion, appoint standby counsel to assist a defendant who has elected to proceed *pro se*. *Id.* The trial court's discretion reaches to the appointment of standby counsel and the determination of the extent and nature of standby counsel's involvement. *Id.* A trial court's decisions in these regards will not be reversed on appeal absent an abuse of discretion. *Id.* A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view of the trial court. *People v. Limon*, 405 Ill. App. 3d 770, 772 (2010).

¶ 57    On May 8, 2019, defendant informed the court:

"THE DEFENDANT: I just would say that you are correct that I am not a lawyer so I am actually requesting a Public Defender to be appointed to me.

THE COURT: For what purpose?

THE DEFENDANT: I just—I am requesting a Public Defender to be appointed for me for purposes of trial and anything else I may need.

THE COURT: So you're surrendering control of the case, if you will. On those matters that would be the decision of an attorney, you want the Public Defender appointed in its full capacity, I take it?

THE DEFENDANT: Correct."

¶ 58    The following took place during the trial court's discussion with defendant two months later, on July 12:

"THE COURT: Now, tell me what it is you understand or what it is you would want from standby counsel.

THE DEFENDANT: I'm just requesting him as an advisor.

THE COURT: An advisor as to what?

THE DEFENDANT: Well, as I said earlier, if they can have two prosecutors, why am I subject to a double standard?"

Defendant explained that he "had no choice" but to fire the public defender "because [counsel] was ill prepared in two months" of trial preparation. Under questioning from the trial court, counsel told the court, "[N]o, I don't believe that I would have been deficient in my performance as appointed counsel."

¶ 59    When the trial court asked what type of advice he would seek from standby counsel, defendant answered:

"For—for everything, really, for trial. For the sake of trial, as I said earlier, when I first asked for the appointment of the PD for trial preparations, helping me to prepare for trial, maybe helping me—something as guiding me the right way for jury instructions, jury preparation, jury choosing, and also for the sake of, for the record, making sure everything is covered.

And in terms of having standby counsel to know that, you know, if things are being objected, I have someone there that can—to have two set of ears to make sure everything is being recorded properly. Because, you know, getting motions denied or transcripts denied in its entirety, and other things being denied to me, I feel as I've been put at a complete disadvantage to a fair—to a fair trial now.

And just with these subpoenas getting quashed today just solidifies my reasons why I am requesting a co-advisor, and there's two of them, there's two state's attorneys here that have been working on this case for well over two years now. They've been preparing. Well, of course they're going to be ready. I mean, one can do one aspect of the case and the other one can work on something else.

And here I'm just asking for him for basically as co-counsel as well, so I shouldn't be subjected to that double standard.

* * *

THE DEFENDANT: And then—then I make my case here that I need—I shouldn't be subjected to a double standard, a case this complex and this protracted.

THE COURT: This complex, protracted case, Mr. Hui, you had four or five months to prepare for the last trial date, and did so diligently. Month after month we were in court talking about the various facts and issues.

- 24 -

So this is not something foisted upon you at the last moment, and it is a reality of your own choosing when you discharged Mr. Gifford yesterday, though Judge Bakalis correctly informed you of the extreme unlikelihood that the case would be continued. One moment.

I believe that the steps the Court has taken to ensure that the public defender investigator is available to assist, as it relates to all subpoena matters, is sufficient. The request for standby counsel in this particular context is going to be denied."

¶ 60    In determining whether to appoint standby counsel, a trial court should consider (1) the nature and gravity of the charge, (2) the factual and legal complexity of the proceedings, and (3) the abilities and experience of the defendant. *People v. Gibson*, 136 Ill. 2d 362, 380 (1990). Here, the charges were indeed serious. Defendant faced 13 counts of predatory criminal sexual assault and one count of aggravated criminal sexual abuse, and his convictions led to a sentence of 75 years in prison. However, the facts and law at issue were not complex. The allegations involved multiple instances of either digital or penile penetration of the victim's sex organ, oral contact with the victim's sex organ, and transfer of semen on the victim's body occurring at various points and locations within an approximately two-year period. There was no expert testimony or scientific evidence involved. Finally, defendant was college-educated and had briefed, litigated, and argued multiple complex pretrial motions over a two-year period leading up to trial. Based on these factors, we cannot conclude that the trial court abused its discretion in denying standby counsel.

¶ 61    We also note that, when the trial court appointed counsel only two months earlier, defendant requested the appointment "for purposes of trial and anything else I may need." He agreed with the court that he would be "surrendering control of the case" and that the public

defender would be appointed "in its full capacity." Yet, within two months, defendant discharged the public defender. Both times that he discharged counsel, defendant had been admonished about the potential perils of representing himself, especially in regard to trial, but defendant opted for *pro se* representation nonetheless. While defendant made the decision to represent himself, he also complained that the State was represented by two attorneys and that he was subject to a double standard because he was alone.

¶ 62    Defendant's request for standby counsel also contradicted his prior representations regarding the very same public defender whom he just discharged. In the written motion to discharge the public defender, counsel noted: "The Defendant has been apprised of and understands that decisions relating to trial strategy are within the purview of the attorney. The Defendant would prefer to direct the legal strategy in this matter, knowing that it would require discharge of appointed counsel." Defendant told the trial court that he wished to discharge the public defender because counsel "was ill prepared in two months" of trial preparation. Yet defendant now argues that the trial court erred in failing to appoint the same attorney who was "ill prepared" for trial and whose strategy he did not wish to follow.

¶ 63    The appointment of standby counsel frequently creates more problems than it solves. *People v. Williams*, 277 Ill. App. 3d 1053, 1059 (1996). There is no "bright line" test regarding the role of standby counsel; appointing standby counsel provides an unsuccessful *pro se* defendant the opportunity to argue on appeal that standby counsel either violated his right to proceed *pro se* or otherwise acted improperly. *Id.* at 1060. Given defendant's stated displeasure with counsel's preparation and trial strategy, we fail to see how the trial court abused its discretion in failing to appoint the public defender as standby counsel. We find no error in the trial court's refusal to appoint standby counsel.

¶ 64                                    III. CONCLUSION

¶ 65    For these reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 66    Affirmed.

---

**No. 2-19-0846**

---

| | |
|---|---|
| **Cite as:** | *People v. Hui*, 2022 IL App (2d) 190846 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 15-CF-1064; the Hon. Liam Brennan, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Sade V. Edwards, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Adam J. Rodriguez, Assistant State's Attorneys, of counsel), for the People. |

---